Laramore, Judge,
delivered the opinion of the court:
This is a suit for the recovery of alleged termination costs growing out of a contract that was terminated for the convenience of the Government pursuant to the Contract Settlement Act of 1944, 41 U.S.C. 101, et seq.
The contract involved in this case was originally entered into with Philips Laboratories, Inc. However, on July 2, 1954, they entered into an agreement with the defendant whereby the plaintiff herein was substituted as the contractor under the contract.
The facts in this case are set out fully in the findings and will only briefly be related in this opinion.
Towards the end of World War II a Dutch company known as N. Y. Philips Gloeilampenfabrieken was engaged in developmental work on an external combustion engine. In September of 1944, after the Germans had been driven out of Holland, an Allied mission went to the Netherlands to obtain technical intelligence on various projects. Reports on the nature of the Philips’ developmental work were sent to Washington where they created interest on the part of the Navy’s Bureau of Ships. As a result of this interest, the Navy and Philips Eindhoven decided to join forces for the further development of these engines. It was determined that these engines could best be developed in the United States and a new corporation known as Philips Laboratories, Inc., was formed on June 11, 1945, for that purpose. Pursuant to this plan it was agreed between the parties that a group of Dutch technicians and their families, together with special equipment and technical data, would be brought to this country for a period of 18 months. Even though no contract was signed at that time, this group immediately began work at Dobbs Ferry, New York, on the development of the new engine.
Thereafter, following nearly nine months of negotiations, a contract was entered into on June 19,1946. This contract was dated June 1,1946.
*757 During tbe negotiations, Philips proposed to undertake a cost contract with the Navy which would include task orders for various units of work. It was ultimately agreed that each task order would fall into one of three categories, depending upon the relative commercial and military value of the engine to be developed. The Navy would pay 60 percent of the cost of a task order with high commercial potential, 80 percent of the cost where there was only a moderate commercial potential, and 100 percent of the cost where the end product of a task order had only military potential.
It was intended that the contract would last 10 years. The general provisions of the contract provided that title to all property purchased or produced for use under the contract should vest in the Government. The contract contained provisions whereby Philips would pay 40 percent of the cost under the first three task orders. The contract further provided that the Government must reimburse the contractor, upon termination, for all costs and expenses for which the contractor was to be reimbursed or otherwise compensated under the contract and for which payment had not been made prior to the termination. In the event of such a termination by the Government, Philips was to transfer title (to the extent that title had not already been transferred), and deliver to the Government the fabricated or unfabri-cated parts, work in progress, completed work, supplies and other material produced as a part of or acquired in respect of the performance of the work terminated, as well as special tools and tooling acquired or manufactured for the performance of the contract.
On September 10, 1946, Task Order No. 1 was issued, and on December 20, 1946, Task Order No. 2 was issued. The spirit and intent of these task orders was stated to be embodied in the Navy letter of intent dated September 26,1945. These orders, containing special details, called for the development and construction of a new type external combustion engine to be incorporated in a standard generating set. It was estimated that the work would require 20 months of development. However, technical difficulties were encountered, and in February 1947 Philips advised that the work on the first three task orders would run over 27 months.
*758 Due to a limitation on the Navy’s funds, as well as some impatience with the progress of the work on Task Orders Nos. 1 and 2, the Navy amended these orders so as to remove electrical generator requirements and permit the work to concentrate on engine development.
On March 12,1948, Task Order No. 3 was issued and three days later Task Order No. 2 was terminated. However, it was provided that work under Task Order No. 3 should not begin until the first “basic” engineering prototype engine covered by Task Order No. 1 was accepted by the Government. Philips prematurely delivered the work product under Task Order No. 1, which was accepted by the Government on June 1, 1948. The Navy then authorized Philips to proceed with Task Order No. 3. Shortly thereafter, Philips admitted being overanxious on the first engine and requested its return for additional development.
On April 26,1949, Philips proposed to the Navy that Task Orders Nos. 1 and 3 be terminated and that a fourth task order be issued. In support of this proposal Philips pointed out that the requirements of Task Order No. 1 had been substantially satisfied and that it would be impractical to press for further refinements. As to Task Order No. 3, it was stated that there was no apparent interest in that type of on gin e. Philips suggested the development of a 1-horse-power engine as the next logical step in the development process. This proposal was rejected by the Government on May 12,1949.
On October 25, 1949, it was decided that the contract be terminated for the convenience of the Government.
On March 2, 1950, the contracting officer determined that Philips’ performance was complete, but disagreements arose concerning the scope of Philips’ termination claim. It is as a result of these disagreements that this lawsuit was instigated. The plaintiff seeks a fair and reasonable amount for its termination costs and expenses.
The plaintiff predicates a claim for recovery on each of four counts: First, an equity in the termination inventory equal to 65 percent of 40 percent of the cost of such inventory. Second, interest on the amount of its claim from the date of the termination of the contract. Third, expenses *759 alleged to have been incurred as a result of the termination of the contract. Fourth, expenses alleged to have been incurred as post-termination expenditures.
We will deal with each of these counts in order. In the first count, the plaintiff contends that it never intended to enter into a contract that provided that it would pay 40 percent of the costs of machinery, materials and equipment which would be required for use during the life of the contract, which was to be for a period of 10 years, give the Government immediate title to those things, and then give the Government the right to terminate the contract at any time thereafter, and thereby obtain a windfall of 40 percent of the costs of those items. The plaintiff recognizes that it did just that, but emphasizes that it is not an equitable situation. This is a reasonable interpretation and we agree with this contention of the plaintiff. However, when the plaintiff applies this sound argument to the facts in the instant case it carries the reasonableness of its position beyond the bounds of propriety.
For convenience the plaintiff’s first count may be divided into three distinct claims, as follows: (1) engine models; (2) materials, tools and equipment; (3) capital equipment. Plaintiff lumps the above-mentioned items under the heading of inventory and argues that inasmuch as the contract, which was to run for 10 years with the plaintiff paying 40 percent of the cost, was terminated after three and a half years, their costs should only be 35 percent of the 40 percent. However, when the claim is broken down into these categories it becomes clear that this argument is sound only as to part of the claim. The materials, tools and equipment which are properly labeled inventory are those items which would be used during the course of the contract, other than capital equipment. When the contract was terminated the title to these items vested in the defendant. These items had a specific value at the time of the termination for which the defendant had paid only 60 percent of the costs. As to these items the plaintiff had an equity based on its 40 percent share of the costs. A list of this equipment on hand at the termination of the contract is as follows:

*760

Therefore, plaintiff is entitled to recover $19,954.33 based on its equity in tbe value of the inventory. Only the above-listed material is inventory. The four engines which constitute the basis for the major portion of the plaintiff’s claim can hardly be called inventory. As to the engines, the plaintiff has no equity for several reasons. First, there is no basis in claiming that the value of the engines at the time of the termination of the contract is the cost of the engines. This was a research and development contract for which millions of dollars might be spent but the result be valueless. On tbe other hand, the more successful the development the less valuable the end product because they were seeking to develop an efficient yet economical prime mover. Therefore, if they had been successful, the result would have been an inexpensive engine. Surely, they cannot have a better claim because they were unsuccessful.
Second, the fact that the contract was to run for 10 years is in no manner connected with this part of the plaintiff’s claim. The engines were not developed under the general contract but under specific task orders pursuant to the general contract. There is no requirement in the contract which makes it mandatory for the Government to spend a certain amount each year or describes specifically the engines to be developed. It was intended at the time tbe contract was entered into that the contract itself should broadly cover the developmental work but that details of particular projects should be specified in separate task orders. The equity, *761 if any, that the plaintiff would have would be measured over the life of a particular task order, not over the life of the 10-year contract. Since it was estimated that it would require 20 months to develop the type of engine desired, and plaintiff actually worked on the engines for three and a half years, any equity that the plaintiff might have had was completely exhausted.
Third, a contributing factor leading to the termination of the contract was the plaintiff’s dissatisfaction with the terms of the specific task orders and the lack of commercial possibilities for the type of engines being developed. In fact, plaintiff requested the defendant to terminate the two outstanding task orders because it felt that one was substantially developed and the other was of no interest. How then can these engines be of such value to the plaintiff ? Clearly, it is simply an attempt to recoup a substantial amount of the expenses which the plaintiff contracted to incur in the expectation of receiving commercial benefits. Since these commercial benefits did not become a reality, it would appear that the plaintiff entered into a bad bargain, but this can be of no concern here. It would appear that the plaintiff received exactly that for which it bargained. Therefore, the plaintiff is entitled to no part of its claim as to the engines. This is in no way unfair to the plaintiff for it need only be pointed out that the results of research are both tangible and intangible. True enough, the Navy received the physical assets, but the plaintiff retained the “know-how” at a cost of only 40 percent. In other words, plaintiff received 100 percent of the “know-how” with an expenditure of only 40 percent of the costs.
The third part of the plaintiff’s first count concerns capital equipment. It should be noted that the determination of this issue is not based on equity but merely follows the terms of the contract as agreed to by the parties.
The pertinent parts of the contract are set out as follows:
Section 5. (a) Title to property purchased for the performance of this contract and for the cost of which the Contractor is entitled to be reimbursed under this contract shall automatically pass to and vest in the Government upon delivery to the Contractor, or upon the happening of any other event prior to such deliv *762 ery by which title passes from the vendor or supplier thereof. Title to property not so purchased, but for the cost of which the Contractor is entitled to be reimbursed hereunder shall pass to the Government upon allocation thereof to this contract by the commencement of processing or by use thereof or otherwise.. Such vesting of title shall not impair any right, which the Government might otherwise have under this contract, and shall not relieve the Contractor of any of its obligations under this contract.
*****
Section 8. (b) After receipt of a Notice of Termination and except as otherwise directed by the Contracting Officer, the Contractor shall (1) terminate work under the contract on the date and to the extent specified in the Notice of Termination: * * * (6) transfer title (to the extent that title has not already been transferred) and deliver to the Government in the manner, to the extent and at the times directed by the Contracting Officer (i) the fabricated or unfabricated parts, work in process, completed work, supplies and other material produced as a part of or acquired in respect of the performance of, the work terminated in the Notice of Termination, (ii) the plans, drawings, information and other property which, if the contract had been completed, would be required to be furnished to the Government, and (iii) the jigs, dies, fixtures, and other special tools and tooling acquired or manufactured for the performance of this contract for the cost of which the Contractor has been or will be reimbursed under this contract: * * *.
There is no doubt that this equipment was purchased for the performance of this contract. The plaintiff initially paid the full costs of such equipment and it was intended that the defendant reimburse 60 percent of this expense on a monthly basis spread out over the 10-year term of the contract. In fact, this procedure was actually followed until the contract was terminated. At that time the title to the equipment should have been transferred to the Government, and the plaintiff should have been reimbursed for its un-amortized portion of the contract. As a matter of law, title to the capital equipment was in the Government. Therefore, the termination of the contract was an effective means of depriving plaintiff of the opportunity for further use of that equipment during the remainder of the 10-year period of *763 tlie contract. As a result, the plaintiff is entitled to recover $14,063.94 as its unreimbursed share of the original cost. Defendant, of course, is entitled to the proceeds from the sale of this equipment which is presently being held in an escrow account. It is our determination that the plaintiff is entitled to recover $34,018.27 under the first count in this petition.
Plaintiff, in count two of its petition, makes a claim for interest on the amount of its claim from the date of termination of the contract. Plaintiff’s entire claim is predicated under the Contract Settlement Act of 1944, supra, as it must be because this action was filed August 13, 1956, based on a cause of action that arose November 7, 1949. If the provisions of this Act do not apply in this instance, then the petition must be dismissed as without the general jurisdiction of this court. 28 TI.S.C. 2501.
However, it was the intention of the parties that the provisions of the Contract Settlement Act, supra, would apply, as evidenced by the developments since the contract was terminated. The Supervisory Inspector of Naval Material, New York, in his report indicated that the Act applied. The contracting officer, J. C. Marley, allowed a portion of plaintiff’s claim for interest on the basis of the Act. The contracting officer adviser plaintiff as late as May 15, 1956, that the provisions of the Contract Settlement Act of 1944, supra, governed this termination claim. The Government concedes in its brief that the interest on the settlement award would be increased proportionately if the court should conclude that plaintiff was entitled to more than it received. Since we do reach this conclusion, it follows that the plaintiff is entitled to interest at two and one-half percent, commencing 30 days after the termination of the contract, as provided under the Contract Settlement Act, supra. However, since the amount of plaintiff’s recovery has yet to be determined, it will be necessary to reserve a determination of the amount of interest until the amount of the claim is determined pursuant to Eule 38 (c).
In count three of the petition plaintiff makes claim for expenses allegedly incurred as a result of the termination of the contract.
*764 It is conceded and tibe commissioner has found as a fact that in the event of recovery under count one of the petition plaintiff will withdraw count three from consideration. However, it is apparent that this concession was made by plaintiff premised on the recovery of the major item of count one; i.e., that defendant took certain engines already developed and plaintiff was deprived of the use of these models in its future development operations. We have not allowed recovery on this item of plaintiff’s claim. Consequently, we believe that under these circumstances plaintiff did not intend to waive its claim, and therefore count three is a proper subject for our consideration.
The contract provides that in the event of termination by the Government the contractor shall be paid:
(1) All costs and expenses for which the Contractor is to be reimbursed or otherwise compensated under this contract and as to which payments have not previously been made to the Contractor for the performance of this contract prior to the effective date of the Notice of Termination and such of these costs and expenses as may continue for a reasonable tune thereafter with the approval of or as directed by the Contracting Officer (which approval shall not be unreasonably withheld) : Provided, however, that the Contractor shall proceed as rapidly as practicable to discontinue such costs and expenses.
It is noted that subsection (1) above provides that approval shall not be unreasonably withheld. We believe that inasmuch as the plaintiff actually paid certain termination costs, it is consistent with this provision that said costs be paid by the Government, and the contracting officer acted beyond the scope and intent of the contract when he denied payment. In other words, failure to approve was unreasonable in the circumstances.
Based on the above, we are of the opinion that plaintiff is entitled to recover the termination expenses which were paid and which were necessary and proper.
In respect to count three, the commissioner has found that if the plaintiff should prevail, the determination of the amount due will require consideration of evidence not in the record, concerning the necessity or propriety of certain expenditures which form the basis of this claim. Therefore, *765 we are remanding tliis item of plaintiff’s claim to the commissioner of this court to determine which items of termination costs were necessary and proper, together with the amount thereof, consistent with the above.[1]
Plaintiff’s claim under count four of the petition is for settlement expenses disallowed from its post-termination claim, and includes a claim for expenses incurred in arranging for disposal of a part of the capital equipment inventory to Columbia University. The original claim was for $71,457.21 and of this amount $11,904.56 was allowed to plaintiff. However, the balance of the claim was disallowed.
There can be no question that Philips had incurred and paid the post-termination expenses claimed because on May 24, 1954, Philips submitted an invoice to the Navy covering these claimed expenses. The claim was audited and a Navy cost inspector found that all of these costs had been incurred and paid, with the exception of interest and payments contingent upon final settlement. Finally, however, the contracting officer disallowed Philips’ claim.
Since we have held that title to the capital equipment was in the defendant, we can see no reason why plaintiff should bear the expense burden of the disposal thereof to Columbia University. Consequently, the court is of the opinion that these expenses are an item for which plaintiff should recover.
We are also of the opinion that plaintiff should recover the post-termination expenses paid which were necessary and proper, for the reason stated in our opinion as to count three of the petition; i.e., that payment therefor was consistent with the contract provisions.
*766 The commissioner has found that the claim under count four will require consideration of evidence not now available in the record and has recommended that the determination of specific amounts and the necessity and propriety thereof be reserved pursuant to Rule 38(c) for a determination consistent with this opinion. Therefore, we are remanding this portion of plaintiff’s claim to the commissioner to determine the amount of expenses incurred by plaintiff in the disposal of the capital equipment and a determination of the amount necessarily expended by plaintiff as post-termination expenses.
In summary, it is the determination of the court that the plaintiff is entitled to recover on count one of the petition the sum of $34,018.27. Plaintiff is further entitled to recover under count two of the petition the interest on the total amount of its termination claim, commencing 30 days after the termination of the contract. Plaintiff is further entitled to recover on count three of the petition the necessary and proper expenses actually incurred in the termination of the contract. Plaintiff is further entitled to recover on count four of the petition the necessary and proper post-termination expenses actually incurred.
The case is remanded to the commissioner of this court under Rule 38(c) for a determination of the amount of interest due under count two of the petition, and for further evidence concerning the necessity and propriety of the expenses, and the amount thereof, claimed under counts three and four of the petition.
It is so ordered.
Durfee, Judge; Madden, Judge; Whitaker, Judge; and Jones, OMef Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Robert K. McConnaughey, and the briefs and argument of counsel, makes findings of fact as follows:
1. In the Netherlands there is and has been for many years a large electrical manufacturing company known as the N. Y. Philips Gloeilampenfabrieken, hereafter sometimes *767 referred to as “Philips Eindhoven” or as the “Philips Company.” During the German occupation in World War II, the Eindhoven Laboratories of the Philips Company in Holland secretly carried on development work on an external combustion engine, sometimes referred to hereafter as a “heat engine” or as a “hot gas engine.”
2. In September 1944 after the Germans had been driven out of Holland, an Allied mission headed by Sir Robert Watson-Watt and including a representative of the United States Navy, referred to hereafter as the “Navy,” went to Holland for the purpose of obtaining technical intelligence. Reports of the development work being done at Eindhoven were sent to Washington where they reached the Research Section in the Navy’s Bureau of Ships.
3. Due to the Navy’s interest in the Philips Company’s experimental work on external combustion engines, demonstrations were arranged at Eindhoven in February and April 1945 for Navy representatives. At that time drawings, preliminary specifications, and other information concerning the engines under development at Eindhoven were supplied to the Navy representatives by the Eindhoven Laboratories. Subsequently, this information also was sent to the Navy in Washington.
4. The Navy recognized that the external combustion engine was in the development stage and that there was no assurance that it would ultimately achieve practical application. Nevertheless, with the objective of meeting a then current Navy requirement for small reliable engines, the Navy promptly took steps to arrange for its further development in the United States.
Philips Eindhoven cooperated with the Navy’s efforts to arrange for continuance of the development of the engine in the United States where more readily obtainable materials, machines, and labor could make possible more rapid advances in the work and where it would be easier to coordinate the development with the Navy’s needs. Philips Eindhoven recognized that such action endangered its patent and commercial rights and throughout the negotiations took various steps designed to protect and preserve such rights but, in going along with the arrangements for carrying on develop *768 ment of the engines in the United States, accepted certain risks concerning them.
Among the factors motivating Philips’ cooperation were: (a) at the outset, a desire to further Dutch contribution to the war effort; (b) threats emanating from the U.S. military establishment that development of the engines in the United States might be taken over by someone else if it did not progress satisfactorily; (c) the more ready availability in the United States of materials, tools, labor and other facilities for rapid development of the engine; and (d) commercial market possibilities believed to exist in the United States which Philips’ representatives thought could best be exploited by American methods and with a well-founded American organization.
5. Early in May 1945 the Navy in Washington sent an urgent message to the Navy Technical Mission in Paris, requesting shipment from Eindhoven to the United States of any available model of the new engine, together with any technical data available and the necessary technical people to carry out development work with a view to manufacture of the engines in the United States.
6. Representatives of Philips, in company with representatives of the Navy, made contacts late in May 1946 with several established manufacturing companies in the United States to try to arrange for their participation in the development and manufacture of the new type external combustion engine. No such arrangements were ever perfected.
7. Later in May 1945 the Navy advised Philips’ representatives that arrangements for the development and manufacture in the United States of the engine must be made within a reasonable time after the arrival of the existing models and technical information from Holland, or the Navy would step in and take over the development and designate a manufacturer to proceed with the development work.
8. On May 30, 1945, representatives of the Navy and of Philips met in Washington. It was agreed at that meeting that the Philips interests in the United States would perform the development and preliminary manufacturing work on the engine. It was suggested that either North American Philips Co. or a new corporation then being *769 formed, to be known as Philips Laboratories, Inc., should be the contracting party, preferably the latter. The Navy advised Philips’ representatives that the lack of any performance specifications on the new engines precluded use of a procurement contract and that a development contract would have to be used. Two types of development contracts, cost-plus-a-fixed-fee and fixed-price, were discussed; and sample copies of such contracts were furnished to Philips’ representatives.
Philips’ representatives informed the Navy that Philips intended to give the United States Government a nonexclusive, nontransferable, royalty-free license on the heat engine for the duration of the war and six months, or termination of the last Government contract, provided Philips succeeded in establishing 50 percent ownership of the company that would do the development and manufacturing.
9. On June 14,1945, Philips’ representatives in the United States again communicated with Philips Eindhoven through Navy channels and obtained clearance to cooperate fully with the Navy in the development of the new engine in the United States. Thereafter, Mr. Donovan, Philips’ designated project manager, went to Eindhoven to expedite the arrangements. At the Navy’s insistence it was arranged that Professor Gilíes Holst, Director of Philips’ laboratories in Eindhoven, and Mr. Herre Lima, one of the inventors of the new engine, should come to the United States from Holland as soon as possible to assist in making preliminary arrangements for its development in the United States.
10. In July 1945 the Navy Technical Mission in Europe advised the Bureau of Ships in Washington that it had not acted promptly in the matter of the external combustion engine, because, in its opinion, technical development of the engine would take too long to be of use in the war effort. The Commander of Naval Forces in Europe agreed with the opinion of the Navy Technical Mission. The Bureau of Ships in Washington did not concur, however, and continued to exert pressure on Philips’ interests in this country to begin development of the engine in the United States promptly.
*770 11. During the first week of August 1945, a representative of the United States Army Ordnance Laboratory at Detroit expressed to Philips’ representatives the intention of that organization to develop the Philips external combustion engine through the General Motors Corporation on the basis of data previously supplied by Philips Eindhoven to the Watson-Watt Mission. Philips’ representatives pointed out to both the Army Ordnance Laboratory and the Navy Bureau of Ships that such activity would not help the war effort and would greatly damage Philips and that there had been no delays whatever on its part in meeting the requests of the Government. They also pointed out that Philips would proceed quite differently if the development of the engine were a purely commercial matter, but that Philips had agreed to develop the engine in the United States even though its patent and commercial rights were thereby jeopardized because of Philips’ desire to help in the war effort and because of pressure exerted by agencies of the United States Government.
12. Despite some delay on the Navy’s part in perfecting the necessary clearance for Holst’s and Binia’s travel to the United States, they finally arrived late in August 1945.
13. After several conferences between Philips’ representatives, including Holst and Binia, and the Navy in late August and early September 1945, it was finally settled that the Philips organization itself would handle the development of the engine in the United States and that the most expeditious way to do so would be bring from Holland to the United States the entire technical staff that had worked on the engine in Eindhoven, together with their families.
14. World War II hostilities ended in August 1945. The Navy’s interest in immediate development of the engine was not thereby diminished. Other branches of the United States military establishment also continued to show great interest in its development.
15. On September 14, 1945, after further discussions and negotiations with the Navy in regard to the arrangements for commencing development work on the new engine, Mr. Donovan, who acted as Philips’ principal spokesman *771 throughout the negotiations, wrote to the Bureau of Ships as follows:
Re: Importation of Working Group for Development of Philips Hot Gas Engine in the United States
* ❖ * # *
1. Pursuant to our discussion in Washington on 12th September, we wish to record here the next steps necessary for the development of the Philips hot gas engine in the United States.
_ 2. Conditions have changed of course with the cessation of hostilities and we wish to emphasize the fact that this does not alter our objective of obtaining the most rapid completion and development of the engine in the United States as instigated and originally requested by you.
3. As you know, while hostilities were still going on both N. V. Philips’ Gloeilampenfabrieken and this Trustee pushed this matter diligently in line with your wishes and both organizations will continue to do so under the present conditions.
4. May we also point out in this connection, that without the interest of the United States Government we would handle this matter in quite a different manner, pursuant to our own policies. Because of your interest and desire for quick action we have willingly assumed some risks on our future commercial position (without prejudice to future action either on the part of N. Y. Philips’ Gloeilampenfabrieken or ourselves).
5._ As a further evidence of our good faith, this Trustee is willing to consider any proposal you may wish to make for one or more development contracts, and it is our understanding that such a proposal is forthcoming.
6. As noted in the above reference, the critical point up to now has been the arrival of Professor Holst and Mr. Rinia in this country, and this was finally accomplished through the Navy with the arrival of these gentlemen in the United States on August 22nd.
7. Our ensuing discussions with Professor Holst and Mr. Rinia have now developed the following salient points:
(a) There are now in the process of completion in Eindhoven, Holland, three engine models, namely, 2 hp., 12 hp., and 40 hp., and it is hoped that these models will be completed shortly so that they may be shipped into the United States. Professor Holst and Mr. Rinia did not bring a model with them because the existing model was worn out and rather critical to operate.
*772 (b) However, the lack of materials and power in Eindhoven is interfering with the completion of this work and will seriously impede any further research or development in the laboratories there.
(c) Specifically, the development and design of a working engine is difficult and complicated. In other words, the “know how” is critical. It would be a long and tedious process to convey this “know how” piecemeal from Holland to the United States. .
8. Under these circumstances, this Trustee proposes to import into the United States the entire working group of the hot gas engine, together with the special machines and tools developed by this group and the three models above referred to. Messrs. N. V. Philips’ Gloeilampen-f abrieken have agreed to allow us to import this group on loan for a period of approximately 18 months.
9. It is obvious that unless this importation is accomplished, further development of the hot gas engine will be unduly delayed. While ultimately there may be a commercial benefit for us in the matter,- the principal objective here is to bring in this group for the quick development and reduction to practice required by yourselves.
10. A further complication, however, lies in the fact that many of the people whom we propose to import, after five years of war conditions in Holland, are unwilling to leave their families, and we therefore propose to import their families with them.
11. You will find attached a list of thirteen people who comprise the Research and Development Group for the Philips hot gas engine. This list includes a brief description of the marital status of these persons, showing the total number involved to be forty.
12. The models, special machinery and tools involved will total about five tons.
13. We propose that this entire group, together with the models and special machinery and tools, will sail from Rotterdam in the early part of November and we have checked with the Holland America Line here in New York and find this is practicable. We have also notified the individuals in the group to prepare themselves to come to the United States and to bring the necessary models and equipment with them.
14. We would now request that the U.S. Navy Department write to the Hon. H. Gordon Miunigerode, U.S. Consul at Rotterdam, Holland, enclosing a copy of the attached list and informing him of Navy Department support to the issuance of visas for these persons. It is *773 also suggested, if you can agree, that you send a copy of your letter to the Naval Attache at the U.S. Embassy at The Hague.
15. We would appreciate receiving an official copy of your letter to Mr. Minnigerode which we can use with the U.S. State Department and with the Immigration and Naturalization Service to coordinate the entry of this group into the United States.
16. It is the intention that Mr. Einia and the writer will go to Eindhoven about the end of this month to expedite this entire matter.
17. As far as we can estimate at the present time it will be necessary to bring these people here for a period of approximately 18 months to carry out the required development work. As noted, the group will be on loan for this work from Messrs. N. V. Philips’ Gloeilampen-fabrieken, who wish to return them to Holland at the conclusion of the work. In this respect, it should be noted from the immigration standpoint that the importation of this group may well result in a new engine industry which will contribute to the national economy of the United States.
16. On September 26, 1945, the Navy sent to Philips the following letter outlining the agreements reached up to that point and stating the basis of a formal proposal to be submitted by Philips for the development of the hot air engine and setting out the intent and purpose of the proposed contract:
As a result of a conference held at the Bureau of Ships on 31 August between representatives of Philips and of Bu-Ships, Code 338, a tentative program was discussed for the development of two types of small portable engine-generator sets incorporating the Philips hot air engine as a prime mover. It was agreed that the Bureau would furnish the desired characteristics of each set to form the basis of a formal proposal to be submitted to the Bureau by the Philips organization.
Characteristics of three types of sets are discussed below: The 100-200 watt size has different electrical characteristics than were previously discussed because the requirements given herein are of more immediate utility. A set of intermediate size, not previously discussed is included for which a demand is currently arising.
(a) 100-200 watt range. The generator for this power unit should be a dual voltage DC unit delivering *774 500 volts DC at 200 milliamperes and 7 volts DC at 3.5 amperes. Enclosure (1) gives weight, size, and other requirements for this engine-generator set.
(b) 600-750 watt range. The generator of this power unit should deliver 13-14 volts DC. Enclosure (2) _ herein gives the requirements for the gasoline engine-generator unit now under development for this application. It will be noted that the specification calls for but 400 watts output; this is because 400 watts is the maximum so-far attainable with the gasoline engine driven unit. It is desired, if possible, to obtain the 600-750 watts output for the same weight, space, and electrical requirements specified by Enclosure (2).
(c) 1.5 KW 115 volt 60 cycle AC engine generator set. Characteristics of a typical unit of this size are given by Enclosure (3).
It should be pointed out that Enclosures (1) and (2) represent, to a considerable extent, desired rather than actual attained characteristics. Satisfactory sets meeting the requirements of Enclosure (1) do not at present exist. Engine-generator sets meeting space, weight, and electrical requirements of Enclosure (2) are being procured but as mentioned above, more power is desired. The requirements of Enclosure (3) have been developed by determining the characteristics of an existing unit. Electrical requirements of Enclosures (1) (2) and (3) can be met and are considered to be more or less standard items. Primary value of the Enclosures in this respect will be to provide standards regarding materials, finish, etc., all of which are generally acceptable for the type of equipment described. Since the electrical components are more or less standard items it is immaterial to the Bureau whether new units are designed or stock items purchased.
The intermediate size of 600-750 watts is included to allow as much leeway as possible in the choice of engine sizes during the building of initial models. However, it is not desired to spread personnel and facilities too thin by initiating several simultaneous developments. The 125 watt and 1.5 KW sets are considered to be the most immediately important and consideration of the intermediate size is left to the discretion of Philips.
Certain general engine characteristics which are desired of all three sizes are stated below. In the event of conflict between requirements stated below and the specifications of Enclosures (1) (2) and (3), the requirement below shall govern.
(a) Ooolmg — Engines are to be aircooled.
*775 (b) Reliability — The engine shall be capable of operating a minimum of 500 hours without replacement of parts irrespective of the type of fuel burned.
(c) Burner Characteristics — The burner, as destin-guished from the engine proper, shall be capable of 24 hours continuous operation without cleaning, on leaded gasoline containing 3 cc/gal of tetraethyl lead and 500 hours, (b) above, continuously on optimum fuel. A burner capable of operating on either gasoline or Diesel fuel oil would be highly desirable, but will not be specified for the current development. It is desired that burner noise be kept to a minimum consistent with satisfactory operation and that maximum effort be made to reduce the danger of burns to operating personnel from high temperatures on external surfaces of the burner.
(d) Engine Governing — The primary requirement of the governing system is that sufficient control be available to meet the electrical requirements of the above applications. Present gasoline engine-generator sets are regulated by a centrifugal governor connected to the engine throttle. This method of control accomplishes speed regulation of 15 percent, or less, of design speed from no load to full load, and is adequate, with external voltage regulators etc., for al 1 present electrical requirements. It is desired that the same degree of regulation be achieved with the hot air engine, however the method of regulation will not be specified since the determination of the optimum method of control is one of the basic problems to be solved by the proposed development program.
It is desired to obtain two operable self contained units of each size. In order to facilitate development of these sets from already existent engine designs it is anticipated that six (6) engines will be required for each size, the first four engines to serve as experimental units for developing controls, burners, etc. the final two engines of each size to be used in the completed generator sets.
Since the primary problems of the program outlined herein are associated with the development of a new type of compact quiet, and reliable prime mover it is not desired to unduly restrict progress by imposing a set of rigid specifications. Maximum effort is to be placed on developing, in the completed units, superior prime mover reliability to that now attained by existent gasoline engine-generator sets of comparable size and output. However, success of the prime mover development will in the present instance, be judged largely by the electrical perform- *776 anee of the engine generator sets. To this end the Bureau of Ships Electronics Division will gladly furnish more detailed information and advice on the electrical components required for the development. A proposal is hereby requested based upon the above outline of Bureau requirements.
It is further desired to acknowledge your letter of 14 September 1945. The Bureau concurs with the method of physically initiating the engine development as proposed therein, and will request the cooperation of the State Department in clearing the Dutch personnel for entrance to the U.S.
17. Meanwhile, Philips Laboratories, Inc., had been incorporated in Delaware on June 11, 1945. Pending the arrival of the Dutch technicians, Philips Laboratories, Inc., in the latter part of 1945, had obtained facilities at Dobbs Ferry, New York, and had begun preliminary arrangements for the actual development work.
18. On October 18, 1945, Philips Laboratories, Inc., in response to the Navy’s request of September 26, 1945, submitted a proposal to the Navy, subject to a 60-day validity limit, to enter into a fixed-price developmental contract with the Navy for research and development on three sizes of external combustion engine generator sets. The understanding was expressed that rigid specifications would not be applied to this development work since its primary object was the development of a new type of compact, quiet, and reliable prime mover. Philips reiterated that the transfer of the development work, along with the accompanying personnel, from Plolland to the United States was then being done at the request of and as a service to the Navy even though it entailed grave risks to Philips’ patent and commercial interests and involved costly disruption of other work at Eindhoven.
19. Upon receipt of Philips’ proposal, the Eesearch Section of the Bureau of Ships instituted and forwarded within the Navy Department a Eequest for Procurement accompanied by the following memorandum, dated October 31, 1945, justifying the request :
1. The Philips engine first came to the attention of the Bureau of Ships in the latter part of April 1945 *777 through the medium of an Army report dated approximately 1 October 1944 transmitted by COMNAVEU. The engine had been developed by personnel of the Physical Laboratory, N. V. Philips Gloeilampenfabrieken, Eindhoven, Holland, and operates on a modified Stirling type of cycle.
2. The Philips engine appeared fundamentally sound in principal to members of Code 338 and looked suitable for application as a prime mover for fractional horsepower generator sets; an application for which a satisfactory prime mover is sadly lacking, but much hi demand at the present time. It was found, that other government agencies were also interested in the same type of prime mover development. The Signal Corps and Bureau of Aeronautics also had information on the Philips engine but had taken no action on the subject. Accordingly, in the latter part of May, the Bureau of Ships initiated action to further investigate the engine with a view toward establishing a United States development program to make the engine available to both the Army and Navy. This Bureau has since retained the initiative in the matter and has maintained contact with BuAero, Signal Corps, Army Engineers and Army Ordnance as to the trend and expected progress of the Philips development.
3. At Bureau of Ships instigation Ur. G. Holst and Mr. F. Binia, the two key men in the engine development group at Eindhoven, were brought to this country in August to provide further technical details of the engine. Discussions were held during August and September with Holst, _ Binia, and members of the Philips Advisory Committee, located in New York City. Bepresentatives of the Besearch Branch were further convinced that the Philips engine is technically sound and that the development in Eindhoven had been done by a very capable group of engineers and technicians. It was agreed that the Bureau would request a proposal (reference (a)) for the construction of three types of small portable engine generator sets. It was further agreed that the development work should be done in the United States and that it.would be highly desirable to have the loan of the entire Eindhoven development group with their technical “know how” during initial stages of the development. Arrangements are now being made, with Bureau of Ships approval, to transport the entire group of thirteen personnel to the United States for the above purpose.
Basis of the Bequest for Procurement (Enclosure (A))
*778 4. Enclosure (D) is the Philips proposal requested by Reference (a) and Enclosure (A) is a procurement request based upon Enclosure (D). Enclosures (B) and (C) give additional information on the Philips engine and on the Philips organization; Enclosure (E) gives a detailed breakdown of the costs estimated in the proposal (Enclosure D).
5. The three sizes of portable engine-generator sets upon which the Philips proposal is based are listed below:
(a) 100-200 watts, dual voltage D.C. unit delivering 500 volts D.C. at 200 milliamperes and 7 volts D.C. at 8.5 amperes.
(b) 600-750 watts, 13-14 volts D.C. unit.
(c) 1.5 K.W. 115 volt 60 cycle A.C. unit.
6. The above size ranges were selected by the Bureau for the following reasons:
(a) Experimental engines in the required size range have been successfully built.
(b) Initiating the development in relatively small sizes makes possible the quickest and cheapest demonstration of practicality; particularly in the development of governors, burner controls, etc.
(c) All three sizes of engine-generator set have immediate practical applications.
(d) Ease of comparison with existing prime movers. With respect to the three sizes chosen the competitive position of the internal combustion engine is as follows:
(1) 100-200 watt size — no internal combustion engine of this size has been built which remotely approaches the desired reliability and quietness of operation.
(2) 600-750 watt size — gasoline engines of this output are widely built, however for the specific Bureau application, the gasoline engine generator set which meets size and weight limitations produces only about 400 watts.
(3) 1.5 K.W. 115 volt 60 cycle A.C. — gasoline engines are in general use for this application but leave much to be desired because of poor reliability, excessive maintenance, and noisy operation.
(e) The incorporation of the engines into generator sets provides a convenient method of testing since the generators are, in effect, built-in dynamometers.
7. It is intended that work done on the proposed engine development be made available for inspection and evaluation by all interested branches of both Services. It is *779 anticipated that completion of operable units of small size will lead to more rapid development of the Philips engine in higher powers applicable to generator sets as well as to marine and land propulsion units. The status of the engine at the present time may thus be likened to that of the free piston gas generator-gas turbine and the constant pressure gas turbine systems in that all three are new types of prime movers not yet out of the development stage. The Philips engine appears most suitable for medium and very low powers in which range the latter two systems do not yet appear feasible.

General Features of the Philips Engine

8. It is anticipated that better reliability and quieter operation than present internal combustion engines will be achieved. Thermal efficiencies intermediate between those of the gasoline engine and the Diesel engine are expected with approximately the same weight and compactness for a given power output. High starting torque and low-speed torque characteristics make larger sizes of the Philips engine applicable to many propulsion applications.
9. Good reliability is expected because of the indirect heating of the cylinder working fluid which eliminates exposure of working parts to the high temperature products of combustion. The nature of the working cycle is such that a barrel type of multi-cylinder arrangement using a wobble plate drive appears very attractive. Low peak pressures for a given MEP eliminate high bearing loads which have heretofore made the wobble plate impracticable for internal combustion engines. The barrel arrangement makes it possible to phase the pistons so that they are double acting, each piston doing the work of compression for the adjacent, following cylinder. By this means the work of compression of the cycle is done by direct energy transfer through the piston, the hot side working as a power piston, the cold side as a compressor piston, similar to the compressor work transfer or a free piston machine. Only forces required to overcome friction and the net force available to do mechanical work are transmitted through the piston rod and wobble plate to the drive shaft.
10. Compactness and high specific output are obtained by pressurizing the entire engine case to increase the density of the working fluid. Since the working fluid is retained within the engine the only power required for pressurizing or “supercharging” is that required to replace *780 leakage losses. The barrel arrangement gives a structurally favorable shape for a pressure vessel so that relatively high pressures (8-10 atm) may be used as a base cycle pressure. The possibility also exists of using a heavy inert gas as a working fluid in order to increase specific output. This possibility is of particular interest for very small generator units of the proposed 100-200 watt size where it may be found that no external generator cooling is required. It would then be possible to pressurize the unit during manufacture and permanently seal the entire engine generator case, making it dustproof and waterproof.
11. Quiet operation is obtained by use of an external, continuous type of burner operating at substantially atmospheric pressure. A wide choice of fuels is thus possible since none of the products of combustion come into contact with working parts. Interchangeable burners will make it possible to run a given engine on practically any type of solid or liquid fuel. The multi-cylinder barrel arrangement is also favorable to burner location since the burners can be effectively shielded to minimize radiation and convection losses.
12. The Philips engine can be controlled by raising or lowering the base cycle pressure within the engine case, by “choking” or restricting the flow of the working fluid between adjacent cylinders, or by fuel control. The first two methods produce a quicker response than fuel control because of the time lag due to the relatively high heat capacity of the hot cylinder head. However fuel control must be used to control the maximum cylinder temperature. Presumably, various combinations of the three methods will be used depending on the application of the engine. Development of satisfactory controls constitutes one of the major problems in the development of the proposed engine generator sets. While the mechanism of control is well understood, little actual work has been done on it, since the major effort of the Eindhoven group to date has been on development of the basic engine elements.

CLOSURE

13. The Philips organization has been most cooperative with the Bureau of Ships in all negotiations to date. As can be seen from the cost analysis of Enclosure (E) they are desirous of bearing a substantial portion of the development cost. While it is realized that the procurement of funds for new development projects is becoming increasingly difficult, it is strongly recommended that the Philips proposal be favorably acted upon in its entirety in order to produce a maximum of practical results at a *781 minimum, total cost to the government. It is considered that the total cost of $248,025 herein involved is a very-reasonable expenditure for the amount of work proposed and for the bringing to the operable stage of a new type of prime mover with as much inherent promise as the Philips engine.
20. Due to delays within the Navy in processing their developmental procurement request, the Bureau of Ships requested Philips to remove the 60-day validity limit from its proposal. This Philips did on December 17, 1945. In the meantime, the Navy continued efforts to expedite the transfer of the Dutch technicians from Eindhoven to the United States. Under Navy auspices, Mr. Donovan went to Europe in November 1945 to attempt to iron out difficulties being encountered in bringing the Dutch personnel to the United States.
21. On January 2, 1946, the group of Dutch technicians arrived in the United States and brought with them a substantial amount of special equipment required for fabricating heat exchangers and other necessary features of the engines. They began work immediately at Dobbs Ferry, New York, on the development of the engine.
22. Thereafter, in early January 1946, the Bureau of Ships reorganized its finances for the balance of the fiscal year. This reorganization resulted in cutbacks in funds available to the Eesearch Section for new development contracts. As a result, further discussions were initiated by the Navy with Philips to determine the status of the work then being done and to establish the basis for the proposed contract. The results of these discussions and recommendations based thereon were stated in a memorandum dated February 26, 1946, by the Eesearch Section to the Chief of the Bureau of Ships. The substance of that statement is as follows:
1. Eeference (a) is a procurement request for the development of three sizes of small portable engine-generator sets incorporating the Philips Hot Gas Engine. Enclosure (A) gives a history of the Bureau of Ships’ interest in the engine and a brief description of its general features and expected advantages.
2. Eeference (a) has been held in abeyance for the past three and one-half months pending reallocation of *782 the reduced 1946 research funds. During this period the Philips organization has continued with the planned program on their own initiative by bringing to the TJ.S. a major portion of the group of technical personnel which originated the engine at Eindhoven. A partially completed 1 KW engine-generator set and special equipment for fabricating required heat exchangers and regenerators has also been brought to the TJ.S. and are located, together with the above-mentioned technicians, at Philips Laboratories, Inc., Irvington, N.T. Two more experimental engines, one of 12 H.P. and one of approximately 40 H.P., are expected to arrive in the TJ.S. during the Spring.
3. Since the arrival of the Eindhoven development group on 3 January 1946, engine designs for the smallest set described by Enclosure (A) have been commenced; A suitable generator has already been obtained for a pilot model and some engine parts are being fabricated. The engine is to be designed for 200 watts engine output and will incorporate the four cylinder arrangement described by Enclosure (A) to provide maximum smoothness of operation.
4. In view of the limited funds now available for new developments, Code 338 cannot now recommend allocation of more than $100,000 to this project from 1946 funds. Accordingly, Mr. Donovan, Philips’ representative, has been requested informally to present a revised proposal for only one of the three generator sets described by Reference (a). Mr. Donovan has countered by pointing to the substantial financial and patent risks assumed by Philips in transferring practically the entire engine development to the TJ.S. The prospect of financial support on the scale originally contemplated provided a powerful inducement to Philips to make this transfer. Mr. Donovan, therefore, raises the question, “If Philips proceeds on the reduced scale now proposed, can assurance be obtained that the original program of Reference (a) will be reinstated in 1947 ?” Mr. Donovan was informed that no binding commitment of that nature could be made as future contracts must depend on the record of accomplishment and on funds available at the time.
5. It is believed that Mr. Donovan can be encouraged to proceed on the basis of a contract for one engine size only, provided he is assured that the Bureau continues to be vitally interested in small engine development and regards the Philips engine as a most promising approach to a solution of the problem. It has become evident to Code 338 in the course of discussions with *783 activities interested in small portable engine generator sets that the development of fractional and low horsepower prime movers lags far behind that of medium and high power engines. Codes 665 and 929 of the Bureau, Aviation Division, MarCorp Hdqtrs., Army Engineers and the Signal Corps have expressed complete dissatisfaction with small gasoline engines because of starting difficulties, noisy operation, excessive maintenance and radio interference. Sound fundamental reasons exist, as detailed in the justification memorandum of Enclosure (A), to sustain the conviction that the Philips engine can be developed to totally avoid these limitations. Accordingly, an authoritative expression of the Bureau’s long term interest in development of small engines is entirely in order.
6. Mr. Donovan will approach the Chief of BuShips in the near future in order to inquire into the present and future prospects for Bureau sponsored development contracts for engines of the Philips design. It is requested, on behalf of 338, that authoritative assurance of the Bureau’s long term interest in small engine development be given him.
23. On April 5,1946, representatives of the Navy, Philips, and other interested branches of the Armed Services met in Washington for the primary purpose of establishing contact between representatives of the interested Government agencies and representatives of the Philips organization and to arrange for an inspection trip for those who might wish to see the development work being carried out by Philips Laboratories at Dobbs Ferry.
At this meeting the Bureau of Ships stated that funds were available for the first of three sizes of small engine generator sets and that it was expected that a contract would be negotiated within a few weeks.
It was also suggested and agreed at this meeting that a steering committee be set up to coordinate the needs of the various branches of the Armed Forces. After the visit to Dobbs Ferry which was set for May 1, 1946, Philips’ representatives gave estimates as to when production prototypes of the engines would be available, but because of the developmental character of the program, no commitment was made as to when mass production of any of the models could be started.
*784 24. At the demonstrations at Dobbs Ferry on May 1 and 3, the initial reaction of the visiting members of the United States Armed Forces was fairly cool, but at the close of the demonstrations, considerable enthusiasm was exhibited by all present. It was determined that the steering committee, which had been proposed earlier, should be organized to represent all of the interests of the combined Armed Forces and to maintain a proper line of development of the new engine, and arrangements were made for the organization of such a committee.
25. On May 9, 1946, a meeting was held between representatives of Philips and representatives of the Bureau of Ships, some of whom were new to the negotiations, at which many of the general terms of the proposed contract were agreed upon. Philips pointed out that in order to get maximum results from the experiments and development of the completely new type of engine, the contract should extend over a period of years. George J. Craven, the negotiator for the Navy, reported that this contract came within the purview of a then recent directive authorizing the making of certain types of contracts for a ten-year period. Thereafter, all negotiations were predicated on the understanding that the term of the contract would be for ten years.
It was agreed that the contract itself should broadly cover the development work but that details of particular projects should be specified in separate task orders. Philips took the position that it should bear a part of the cost of the work in order to protect certain commercial and patent rights it would lose under arrangements whereby the Government would pay 100 percent of costs. It was also tentatively agreed at the May 9, 1945, meeting that the Government would pay 50 percent of the direct development costs, including, up to $25,000, 50 percent of those which had occurred between January 3, 1946, and the date of the contract. Philips would absorb all preliminary nonrecurring operations and the initial transfer of its project to the United States. Philips was to remain free to dispose of all developments commercially.
26. On May 24, 1946, Philips, apparently by prearrangement, withdrew its earlier proposal and submitted a new *785 proposal pursuant to invitation by the Navy. In submitting this proposal Philips again stated that the research and development on the Philips external combustion engine had been carried on before January 1946 in Eindhoven; that the transfer of this work to the United States was done by Philips in accordance with Navy requests on behalf of not only the Navy but of other interested agencies and departments; that the transfer of the development work to the United States involved grave risks to Philips’ patent and commercial rights; that Navy interest continued in spite of the cessation of hostilities; that Philips had brought over the entire external combustion engine research and development group from Eindhoven in December 1945, and that this group was then currently engaged with the facilities at Dobbs Ferry, New York, in performing the development work for the Navy contemplated by the proposed contract; that considerable sums of money had already been expended by Philips and that the total expected cost for the three task orders would be close to $800,000.
Philips proposed to undertake a cost contract with the Navy which would include task orders for various units of work. The first three task orders, covering the three initial sizes of engines to be developed, were outlined in the proposal; and a breakdown of the estimated cost figures for the proposal, including the first three task orders, was included.
27. On May 25,1946, Philips wrote to Mr. Craven, the negotiator for the impending contract, and expressed concern over the pendency in Congress of the so-called “Boykin Act,”[2] which Philips regarded as creating serious new threats to its patent rights in the external combustion engine development work. Philips pointed out again that the transfer of the project from Holland to the United States had been done to aid the Navy and at some risk to Philips’ patent rights. Because of this latest Congressional threat to its patent rights, Philips submitted new *786 proposed contract terms adapted to take into account the new risks threatened by the pending legislation — included was a proposal for a cost contract with no fee whereby the Navy would pay 100 percent of the development costs, with a provision that Philips would refund 50 percent of the costs to the Navy in case the proposed Congressional action threatening Philips’ patent rights failed to materialize. Philips also proposed that the contract should be for 10 years, commencing on January 3, 1946, and that the Navy should defray the expense of transferring the project from Holland to the United States.
28. Upon receipt of Philips’ May 25, 1946, proposals, the Navy pressed for an immediate final determination of the contract terms. On May 28, 1946, negotiations began in Washington between Philips and the Navy. The principal topics of the first day’s discussions were the question of Philips’ patent rights and the effect the pending legislation might have on them. The question of costs was also considered. Philips proposed that the Navy pay 100 percent of the development costs. The Navy objected on the ground that it had been criticized in Congress for paying 100 percent of the development costs on various projects without taking title to all developments, patents, and inventions arising therefrom, and also because this project already showed possibilities of commercial benefit to Philips. Philips then proposed that the Navy pay 75 percent of the development costs. It was ultimately agreed that each task order would fall into one of three categories, depending upon the relative commercial and military value of the engine to be developed. The Navy would pay 60 percent of the cost of a task order with high commercial potential, 80 percent of the cost where there was only a moderate commercial potential, and 100 percent of the cost where the end-product of a task order had only military potential. Although this arrangement was in part influenced by the current availability of funds within the Navy, Philips’ representatives concluded that the provision by the Government of whatever funds might be necessary could be considered as beyond doubt — provided Philips was successful, especially with the first task order.
*787 Philips agreed to assume 40 percent of the costs for the first three proposed task orders under the contract because of the current shortage of Navy funds and also because of the commercial benefits expected to be derived from the initial development work embodied in these task orders. Navy cost participation on future task orders was to be negotiated as each task order was placed, on the basis of the relative military and commercial value of the end-products.
29. On June 6, 1946, Philips received the proposed form of contract, which was prepared by the Navy. In preparing it the Navy used for its “General Provisions” standard forms designed for and customarily used in cost or cost-plus-a-fixed-fee contracts for research and development under which the Government paid 100 percent and the contractor paid none of the costs. The cost-sharing features of this particular contract were reflected in a separate “Schedule.”
During the negotiations in 1946 both parties had agreed that the contract would be for a maximum term of 10 years. The general provisions of the draft so provided, but included also provisions for termination for the convenience of the Government before the expiration of the 10-year period.
The general provisions of the draft also provided that title to all property purchased or produced for use under the contract should vest in the Government.
The “Schedule” contained the cost-sharing provisions whereby Philips would pay 40 percent of the cost under the first three task orders for materials purchased, withdrawn from Philips’ stores, or fabricated by Philips for the performance of the contract, and for equipment purchased and installed for the performance of the contract.
There is no evidence that either party considered or discussed what Philips’ rights in respect of such materials and equipment would be in case the contract should be terminated before the end of the 10-year maximum term, and the draft contained no provision, either in the general provisions or in the schedule, specifically creating or defining any liability of the Government to Philips with re *788 spect to this material and. equipment in case of such termination. It did provide that the Government must reimburse the contractor, upon termination, for all costs and expenses for which the contractor was to be reimbursed or otherwise compensated under the contract and for which payment had not been made prior to the termination.
30. While the proposed contract form was under study by Philips, the War Department Engineer Board requested Mr. Donovan to come to Fort Belvoir to attend a meeting with representatives of various Army Engineer sections. At this meeting, Mr. Donovan was informed that the Office of the Chief of Engineers had ordered certain branches of its office to proceed independently of Philips’ interests with the development of the Philips external combustion engine. Upon Mr. Donovan’s assurance that the development work already being done by Philips on the proposed first task order of the contract, which was then awaiting Philips’ signature, would satisfy certain needs of the Army expressed at this meeting, the Army agreed to submit its further needs through the Bureau of Ships in the form of proposed task orders. It was also agreed that the Engineer Board would write immediately to the Bureau of Ships in order to activate the Steering Committee as soon as possible.
31. On June 13,1946, Philips requested several changes in the provisions of the proposed contract. Most of the changes requested were aimed at protecting Philips’ rights to patents, licenses, and inventions growing out of the work under the contract and out of the preliminary development work done at Eindhoven. None related to a definition of Philips’ rights in case of termination before the end of the 10-year term of the contract.
32. On June 18 and 19, 1946, final contract negotiations were held in Washington between Philips and the Navy. The parties agreed that those changes sought by Philips in its letter of June 13,1946, and agreed to by the Navy, would be incorporated, as an interpretation and understanding, in a letter of transmittal accompanying the signed contract. It was agreed that Philips’ signing of the contract would be conditioned on the Government’s acceptance of the interpretation and understanding expressed in the letter, that *789 the Government’s acceptance would be expressed by its signing the contract, and that the letter would become a part of the contract. Thereafter, on June 19,1946, Philips signed the contract and the letter. The contract was dated June 1, 1946.
33. The following provisions of the contract are especially pertinent to the present controversy:
Section 1. (a) The Contractor shall furnish to the Government the research and development services, reports, plans, prototypes or other articles specified in the schedule or specified, if the Schedule permits, in task orders issued in accordance with the provisions of the Schedule. Bequirements so specified are hereinafter referred to as “the work.”
❖ # sji sf:
Section 3. (a) Elements of Compensation.
As compensation for the work, the Government shall pay to the Contractor such percentage of “allowable costs” as defined in these General Provisions and the Schedule, as the parties agree is applicable to the costs of the particular Task Order for which compensation is made.
(b) “Alloiuable Costs”
“Allowable costs” shall constitute the costs, other than such “overhead expenses” as may be specified in the Schedule, incurred by the Contractor in the performance of this contract and accepted by the Bureau of Supplies and Accounts as chargeable hereunder in accordance with sound accounting practice.
(c) Payment
Once each month the Contractor may submit an invoice supported by a statement of cost incurred by the Contractor for such items in the performance of this contract and claimed to be includible in allowable costs. Such invoices and statements of cost shall be in such form and reasonable detail as the Bureau of Supplies and Accounts shall require. The statements of cost shall be certified by two officers or other responsible officials of the Contractor, one of whom shall be a principal executive officer and one of whom shall be a person supervising accounting under this contract. Promptly after submission of each interim invoices and statement of cost, the Government shall make provisional payment, except as provided below, of the amount shown thereon, minus such percentage thereof as the *790 Contractor bas agreed, in connection with the particular Task Order under wliich the invoice is submitted, to bear under the agreement covering that particular Task Order. For example, since the Contractor has agreed to accept reimbursement at the rate of sixty percent (60%) of allowable costs under Task Orders 1, 2, and 3, to be issued under this contract, and to bear forty percent (40%) of the allowable costs itself, the Government shall make provisional payment, except as provided below, of the amount shown on invoices submitted under these Task Orders, less forty percent (40%) of such amount. At any time or times prior to final gayment on account of allowable costs the Bureau of upplies and Accounts shall make such audit of the invoices and statements of cost as it shall deem proper. Each provisional payment shall be subject to reduction to the extent of amounts included in the related invoice and statement of cost which are found not to constitute allowable cost and shall also be subject to reduction for overpayments or to increase for underpayments on preceding invoices. As soon as practicable after submission by the Contractor of the final invoice and statement of cost, the Government shall pay any balance of allowable cost- All disputes concerning allowable cost under this contract shall be decided by the Chief of the Bureau of Supplies and Accounts, subject to written appeal by the Contractor within thirty (30) days to the Secretary of the Navy, whose decision shall be final and conclusive.
*****
Section 4.
*****
(b) All purchases of equipment necessary for the performance of this contract involving more than Two Thousand Dollars ($2,000.00) for any single purchase and of expenses for plant rearrangement necessary for the performance of this contract involving in excess of Five Hundred Dollars ($500.00) shall be subject to the prior approval of the Contracting Officer, as a condition to reimbursement for such purchases and expenses as allowable costs under this contract.
(c) Except for subcontracts or purchase orders approved under paragraph (a) and (b) of this section, the Contractor shall not enter into any subcontract or place any purchase order under this contract which may involve the payment of more than Three Thousand Dollars ($3,000.00) or such other amount as may *791 be specified in the Schedule, without the prior written approval of the Chief of the Bureau of Ships.
Section 5. (a) Title to property purchased for the performance of this contract and for the cost of which the Contractor is entitled to be reimbursed under this contract shall automatically pass to and vest in the Government upon delivery to the Contractor, or upon the happening of any other event prior to such delivery by which title passes from the vendor or supplier thereof. Title to property not so purchased, but for the cost of which the Contractor is' entitled to be reimbursed hereunder shall pass to the Government upon allocation thereof to this contract by the commencement of processing or by use thereof or otherwise. Such vestmg of title shall not impair any right which the Government might otherwise have under this contract, and shall not relieve the Contractor of any of its obligations under this contract.
íjí
Section 8. (a) The performance of work under this contract may be terminated by the Government in whole, or from time to time in part, whenever for any reason the Contracting Officer shall determine any such termination is for the best interests of the Government. Termination of work hereunder shall be effected by delivery to the Contractor of a Notice of Termination specifying the extent to which performance of work under the contract shall be terminated, and the date upon which such termination shall become effective.
(b) After receipt of a Notice of Termination and except as otherwise directed by the Contracting Officer, the Contractor shall (1) terminate work under the contract on the date and to the extent specified in the Notice of Termination: * * * (6) transfer title (to the extent that title has not already been transferred) and deliver to the Government in the manner, to the extent and at the times directed by the Contracting Officer (i) the fabricated or unfabricated parts, work in process, completed work, supplies and other material produced as a part of or acquired in respect of the performance of, the work terminated in the Notice of Termination, (ii) the plans, drawings, information and other property which, if the contract had been completed, would be required to be furnished to the Government, and (iii) the jigs, dies, fixtures, and other special tools and tooling acquired or manufactured for the performance of this contract for the cost of which the Contractor has been or will be reimbursed under this contract: (7) use his best efforts to *792 sell in the manner, to the extent, at the time and at the price or prices directed or authorized by the Contracting Officer, any property (whether or not title thereto has been transferred to the Government for security or otherwise) of the types referred to in subdivision (6) of this paragraph: Provided, however, that the Contractor (i) shall not be required to extend credit to any purchaser and (ii) may retain any such property at a price or prices approved by the Contracting Officer and provided further that the proceeds of any such transfer or disposition shall be applied in reduction of any payments to be made by the Government to the Contractor under this contract or shall otherwise be paid in such manner as the Contracting Officer may direct: (8) complete performance of such part of the work as shall not have been terminated by the Notice of Termination: and (9) take such action as may be necessary or as the Contracting Officer may direct for the protection and Ereservation of property which is in the possession of the ■ontraetor and in which the Government has or may acquire an interest. The Contractor shall proceed immediately with the prosecution of the work required under this contract notwithstanding any delays in connection with the adjustment of the fixed fee in accordance with this Section.
(c) The Contractor and the Contracting Officer may agree upon the whole or any part of the amount or amounts, including an amount with respect to the fixed fee payable under this contract, payable in connection with the Contractor’s claim under the contract in the event of the total or partial termination of work pursuant to this Section.
(d) In the event of the failure of the Contractor and Contracting Officer to agree as provided in paragraph (c) upon the whole amount to be paid to the Contractor in connection with the termination of work pursuant to this Section, the Government, but without publication of any amounts agreed upon in accordance with paragraph (c) shall pay to the Contractor the following amounts:
(1) All costs and expenses for which the Contractor is to be reimbursed or otherwise compensated under this contract and as to which payments have not previously been made to the Contractor for the performance of this contract prior to the effective date of the Notice of Termination and such of these costs and expenses as may continue for a reasonable time thereafter with the approval of or as directed by the Contracting Officer (which approval shall not be unrea *793 sonably withheld) : Provided, however, that the Contractor shall proceed as rapidly as practicable to discontinue such costs and expenses.
$ * * ‡ *
(3) Any other reasonable cost, approved or ratified by the Contracting Officer (which approval or ratification shall not be unreasonably withheld), incidental to the termination of work under this contract, including legal, accounting, clerical and other costs and expenses (taking into account a reasonable allocation of executive, administrative, and office expenses of the Contractor properly allocable to the termination of such work) incidental to:
(i) termination of subcontracts or orders hereunder:
(ii) cessation of work in accordance with the Notice of Termination and the determination of the amounts due to subcontractors and other third parties:
(iii) obtaining payment from the Government, but only to the extent reasonably necessary for the preparation and presentation of settlement proposals and cost evidence in connection therewith, and:
(iv) protection, disposition, removal, storage, and transportation (including delivery costs into and out of storage resulting from directions of the Contracting Officer), pursuant to paragraphs (b) (7) and (b) (9) hereof, of property in which the Government has or may acquire an interest under this contract (including any Government furnished equipment).
Section 21. Except as otherwise specifically provided in this contract, all disputes concerning questions of fact arising under this contract shall be decided by the Contracting Officer, subject to written appeal by the Contractor within thirty days to the Secretary of the Navy, whose decision shall be final and conclusive. Pending decision, the Contractor shall diligently proceed with performance.
iji ^
The schedule which was attached to and made a part of the contract included the following provisions:
SCHEDULE
* ‡ ‡ *
PERIOD OF CONTRACT: The work under this contract shall commence 1 June 1946 and shall be completed by 1 June 1956.
*794 SECTION A — SPECIFIC COMPENSATION PEO VISIONS
It is estimated, that tlie total cost to the Government for full performance of this contract will not exceed $1,300,000.00. The Contractor agrees to use its best efforts to accomplish performance of the work involved within the said estimate, but neither the Government nor the Contractor guarantees the accuracy of such estimate of cost. If the amounts payable to the Contractor hereunder shall have equaled such funds as have been appropriated and apportioned to this contract, or the total estimated cost, whichever is less, the Contractor shall not be required to continue the performance under this contract unless and until the contract is amended to increase the appropriated funds apportioned to the contract, or the total estimated cost, as the case may be.
The Government shall pay to the Contractor as full compensation for the performance of this contract such percentage of the allowable costs provided for under paragraph (a) “As Allowable Costs” as may be agreed upon with respect to specific Task Orders. In the case of Task Orders 1, 2 and 3, to be issued under this contract,_ the parties have agreed that the Contractor shall be reimbursed to the extent of sixty percent (60%) of such allowable costs for work performed thereunder.
NOTE: The Contractor’s agreement to accept 60% of the allowable costs of performing Task Orders, 1, 2 and 3, to be issued hereunder, in full reimbursement therefor, in consequence of which the Contractor will be required to bear 40% of the allowable costs on these 3 Task Orders, is based upon the fact that the research and development involved in these 3 particular Task Orders contain possibilities of commercial applications of value to the Contractor, and the Contractor’s agreement with respect to these three Task Orders is not to be construed as an agreement to perform any other Task Orders which may be assigned to the Contractor under this contract for less than 100% of the allowable costs therefor. Whether the contractor shall be reimbursed for any other Task Orders on the basis of 100% or less of allowable costs shall be subject to negotiation between the parties, which negotiations shall be conducted with reference to the following general recommendations:
*795 (a) Where the possibility of commercial application under a task order issued under this contract is preponderantly great, the contractor shall be reimbursed for work performed thereunder on the basis of 60% of allowable costs.
(b) Where the possibility of commercial application called a task order issued under this contract approximates the military application, the contractor shall be reimbursed for work performed thereunder on the basis of 80% of allowable costs.
(c) Where the possibility of commercial application under a task order issued under this contract is small or remote and the military application is preponderant, the contractor shall be reimbursed for work performed thereunder on the basis of 100% of allowable costs.
All costs which have been incurred by the Contractor after 3 January 1946, in anticipation and prior to the signing of this contract and which, if incurred after the signing of this contract would have been considered as items of allowable costs under subparagraphs 1 through 6 of this Section shall be reimbursed to the Contractor on the basis of 60% of such allowable costs, except all costs incurred in transportation of personnel and their families from Europe, their subsistence and establishment in this country shall be met fully by the Contractor.
(a) Allowable Costs
(1) Materials purchased directly, withdrawn from the Contractor’s store or stock rooms or fabricated by the Contractor for the performance of this contract; credit to be given to the Government in each case for any surplus of scrap at current prices, whether or not the surplus of scrap is sold.
(2) Salaries and wages of personnel directly employed in the performance of this contract; premiums paid for overtime hours worked by direct labor under this contract, if such overtime is expressly authorized by the Chief of the Bureau of Ships; vacation and sick leave allowances pertaining to employment covered by this subparagraph.
(3) Subcontracted work or services in connection with the performance of this contract.
(4) Purchase and installation costs of equipment and plant rearrangement necessary for the performance of this contract, subject to the provisions of Section 4 of this contract.
*796 (5) AH foreign travel and subsistence sustained before, during or after completion of the contract shall be fully paid by the Contractor.
(6) All costs not excluded by other provisions of this contract which, in the opinion of the Contracting Officer, should be included in the cost of performing this contract, and any such costs shall be specifically certified by the Contracting Officer as being allowed under this subparagraph.

(b)Overhead Expenses:

To coyer overhead costs and indirect charges (herein collectively referred to as “overhead expenses”), the Government shall pay to the Contractor, for the period 1 June 1946 through 31 August 1946, a percentage of the salaries and wages (excluding overtime premiums) specified in subparagraph (a) 2 of this section, such percentage to be negotiated between the Contractor and the Contracting Officer, prior to 15 August 1946. Pending negotiations or determination of such percentage, payments on account of overhead expenses shall be made to the Contractor on the basis of seventy-seven percent (77%) of the salaries and wages (excluding overtime premiums), for the period 1 June 1946 through 31 August 1946, as specified in subparagraph (a) 2 of this section. After agreement or determination of the percentage to apply for the period 1 June 1946 through 31 August 1946, subsequent payments shall be adjusted to compensate for any resulting overpayment or underpayment. Within thirty (30) days before the expiration of each three (3) month period from and after 1 September 1946, either party may request in writing a review and redetermination of the rate or rates for overhead expenses for the next three (3) months period. If the parties cannot agree upon a redetermined negotiated rate for overhead expenses, the matter shall be disposed of as a dispute of fact under the section of this contract entitled “Disputes” and such rate shall be determined thereunder upon the basis of sound accounting principles. The cost of the following items is also included in the overhead:
(a) Social Security Taxes
(b) Workmen’s Compensation Insurance
(c) Communication Expenses
(d) Outbound Shipping Charges
(e) Guard
(f) Travel
*797 SECTION B — DISPUTES AS TO ALLOWABLE COSTS
All disputes concerning questions of fact as to allowable costs arising under tliis contract sb.all be decided by the Chief of the Bureau of Supplies and Accounts, and all disputes concerning questions as to the purpose and the necessity of the wort giving rise to the cost incurred under this contract shall be decided by the Contracting Officer subject to written appeal in either case by the Contractor within thirty (30) days to the Secretary of the Navy, or his duly authorized representative whose decision shall be final and conclusive.
34. The contract provided in the Schedule that the work should be completed within a 10-year period at an estimated maximum cost to the Government of $1,300,000. Philips was to be reimbursed for 60 percent allowable costs for work performed under the first three task orders which were then deemed to have possibilities of commercial application valuable to Philips. The allowable costs included material fabricated or acquired for the performance of the contract and the purchase and installation costs of equipment necessary for the performance of the contract.
The General Provisions of the contract provided for termination of work under the contract in whole, or from time to time in part, whenever the Contracting Officer should determine that such termination was for the best interests of the Government. In the event of such a termination by the Government, Philips was to transfer title (to the extent that title had not already been transferred) and deliver to the Government the fabricated or unfabricated parts, work in progress, completed work, supplies and other material produced as a part of or acquired in respect of the performance of the work terminated, as well as the jigs, dies, fixtures, and other special tools and tooling acquired or manufactured for the performance of the contract.
As to the Government’s obligation upon termination, the contract provided only that the Government should pay to Philips all of the costs and expenses for which Philips was to be reimbursed or otherwise compensated under the contract and for which Philips was to be, but had not yet been, *798 reimbursed or otherwise compensated prior to the termination. Specifically provided for were reasonable costs approved by the Contracting Officer incidental to termination, including legal, accounting, clerical and other expenses incidental to obtaining payment from the Government to the extent reasonably necessary for the preparation and presentation of settlement proposals and incidental protection, disposition, removal, storage, and transportation of property in which the Government has an interest.
The contract contained no provisions expressly creating or defining any liability of the Government to Philips upon early termination in respect of material or equipment acquired or fabricated for use in connection with the performance of the contract.
35. On September 10, 1946, Task Order No. 1 was issued. It provided for development of a new type of external combustion engine in one-quarter horsepower size and its incorporation into a standard 200-watt generator set. This task order provided the formal contractual requirement for work which Philips had been performing for the Navy since the project was transferred from Holland to the United States in January 1946. It included the following provisions:
2. Task Order No. 1 is assigned to cover all necessary work for development, construction and delivery of three (3) generating sets incorporating a new type external combustion engine. This order shall include any experimental engines that may be required for the development of a successful type generating set. The generating sets as finally developed shall be identified hereafter as Type PU-129(XN)/U.
3. The first generating set to be delivered to the Government shall be successful in its operation to demonstrate the principle of this type power plant and shall also deliver the power requirements set forth in this order. The contractor shall then design, construct and deliver two generating power units in its final developed stage, incorporating all desirable features from previous developments. These units shall be strictly interchangeable, part for part, to serve as production prototypes for future production.
4. Eequirements for these units are enumerated below:
(a) The desired capacity of the power plant is 150 watts minimum to 200 watts maximum.
*799 (b) The desired maximum weight of the complete unit is 35 pounds. The design and material used should, therefore, be carefully considered so as to meet or better this requirement.
(c) The maximum overall dimensions desired are 14" x 19" x 10".
(d) The generator shall be a dual voltage unit delivering 500 volts D.C. at a minimum of 200 milliam-peres and 7 volts D.C. at a minimum of 3.5 amperes. The electrical requirements of reference (b) are considered standard.
(e) The engine shall be air-cooled.
(f) The governing system supplied with the engine shall be sufficiently controlled to meet the electrical requirements of reference (b). Speed variation shall be within plus or minus 5% of design speed from no load to full load. The method of regulation is not specified since the determination of the optimum method of control is one of the basic problems of this development.
(g) The engine shall be developed to a point where it can be reasonably expected that it will operate for a minimum of 500 hours without replacement of parts, irrespective of the type of fuel burned. The burner, as distinguished from the engine proper, shall be capable of 24 hours continuous operation (without cleaning) on leaded gasoline containing 4.6 milliliter per gallon of tetra ethyl lead and 500 hours continuously on ordinary gasoline. The burner noise shall be a minimum consistent with satisfactory operation.
5. The contractor shall run sufficient tests to show that the units will operate as specified herein.
6. The following data, reports, plans, etc. shall be submitted to the Bureau of Ships, marked for the attention of Code 643:
(a) A summary report covering the research, design and development work performed to date on these units shall be furnished upon receipt of this Task Order.
(b) Monthly progress reports in accordance with the contract in the schedule Section “C”, paragraph 2, covering the subject Task Order shall be submitted starting not later than 10 October, 1946.
(c) Two (2) copies of test data covering the tests specified in paragraph 5.
(d) Ten (10) sets of assembly and detailed plans of all parts for the production prototype generator units shall be furnished within thirty (30) days after delivery of the units. Shop prints, brown line on white background, are acceptable.
*800 (e) Ten (10) copies of instruction books and itemized parts lists showing the nomenclature and part number of each part in a manner suitable for ordering repair parts for the prototype units shall 'be submitted within thirty (30) days after delivery of the units.
36. On December 20, 1946, Task Order No. 2 was issued. The spirit and intent of this task order was stated to be embodied in the Navy letter of intent dated September 26, 1945. The task order called for the development and construction of a new type external combustion engine to be incorporated in a standard generating set, and set forth requirements similar to those in Task Order No. 1. Task Order No. 2, however, called for a lightweight, portable 1.5 KW size unit.
37. On December 26 the contract was amended to increase the amount allocated to it from $171,000 to $271,000.
38. On February 13,1947, in answer to the Navy’s request for an estimate of financial requirements for the project for the 1947-1948 fiscal year, Philips anticipated an expansion of facilities and personnel and estimated that the Navy’s share of the costs during the approaching fiscal year would be between $450,000 and $675,000.
Technical difficulties in engine development were being encountered, and Philips estimated in February 1947 that work on the first three task orders would run over 27 months, rather than 20 months as originally estimated. Philips’ estimates were based on the assumption that Task Order No. 3 would soon be issued and that at least three additional task orders could be started in 1947.
Due to limitation of the Navy’s funds as well as some impatience within the Navy with the progress of the work on Task Orders Nos. 1 and 2, the Navy advised Philips on March 14, 1947, that it should not plan on any immediate expansion of the Navy’s share in the expenditures to be made under the contract. The Navy also amended Task Orders Nos. 1 and 2 so as to remove the electrical generator requirements and permit the work to concentrate on engine development.
39. On May 19, 1947, Philips submitted a revised estimate of costs for the 1947-1948 fiscal year limited to Task Orders *801 Nos. 1 and 2. The estimated total cost was $385,300 of which the Government’s share under the contract would be $209,200.
40. On December 5, 1947, the contract was further amended to increase the funds allocated to it from $271,000 to $351,000. This amount was further increased to $441,000 on February 11,1948.
41. By January 1948 work on Task Order No. 1 had progressed to a point where a test engine was in operation. At that time the Navy, in anticipation of cancelling Task Order No. 2 and issuing Task Order No. 3 for a 10-15 horsepower engine, sought Philips’ evaluation of the program up to that time. Philips advised the Navy that it was concentrating its work on engineering prototype engines, that the engine then developed under Task Order No. 1 had no commercial value, that the engines called for in Task Order No. 2 should grow out of further development of the work under Task Order No. 1, and that building an engineering prototype of the proposed 10-15 horsepower engine under Task Order No. 3 would require about three years’ work and would cost about $300,000 to $350,000. Philips proposed the completion of Task Order No. 1 by delivery to the Navy of an engine generator set meeting the operating requirements of Task Order No. 1, but without meeting all of the desired physical characteristics now being insisted upon by the Navy. Philips further proposed the cancellation of Task Order No. 2 and development of the engines therein called for under Task Order No. 1. Finally, Philips proposed that Task Order No. 3 be issued for the development of a V-type, four-cylinder engine in the 10-15 horsepower range.
42. Task Order No. 3 was issued on March 12,1948. Task Order No. 2 was terminated for the convenience of the Government on March 15, 1948, and Philips was advised that Task Order No. 1 would be modified.
43. Task Order No. 3 called for the development and construction of an external combustion engine capable of developing 15 horsepower continuously, but provided that work under the task order should not be begun until the first “basic” engineering prototype one-quarter horsepower en *802 gine covered by Task Order No. 1 ivas accepted by the Government.
44. About May 1, 1948, Philips delivered and on June 1, 1948, the Navy accepted the first engineering prototype of the basic one-quarter horsepower engine developed under Task Order No. 1. The Navy then authorized Philips to proceed with Task Order No. 3.
Philips later stated it had been overanxious in delivering the one-quarter horsepower engine, which did not meet the weight or size requirements of the task order, had not undergone 500 hours of testing, and required substantial additional development work.
45. On June 1,1948, the funds allocated to the contract by the Government were increased from $441,000 to $681,000.
46. On February 21, 1949, work on Task Order No. 1 was continuing, and work had commenced on Task Order No. 3. Philips then proposed to the Navy that the first one-quarter horsepower engine delivered under the contract be returned for further redesign and development and estimated that this work, which was needed if the engine were to meet the Navy’s requirements, would require an additional 10 months and would cost about $110,000. Philips further proposed a continuation of work on Task Order No. 3, estimating its completion within 2 years at a cost of $300,000.
At this time Philips stated that experience had proved incorrect the assumption of both Philips and the Government in 1945 that development of any of the types of engines that previously had been built at Eindhoven would be a relatively simple task.
47. On February 25, 1949, in a letter to the Contract Section of the Bureau of Ships, Philips expressed the opinion that unexpected technical difficulties encountered in the development of an entirely new type of engine had resulted in changes in the concept of the program and in the nature of the work being done under it that amounted to a change in the philosophy of the contract, whereby the emphasis had shifted from the development of end products and manufacturing prototypes, which originally had been expected to have commercial potentialities, to the development of basic engineering prototypes having, at best, only a remote pros *803 pect of commercial utility. Philips concurred in the necessity for this change but said that, because of the lack of present or foreseeable commercial value in the work then being done or in prospect, the original cost-sharing arrangement based on Philips’ expectation of commercial benefits from the first three task orders had become an unfair and inequitable burden on Philips. Philips pointed out thaJt the work under Task Orders Nos. 1 and 3 now had solely mili-equitable burden on Philips. Philips pointed out that the cost participation feature of the current task orders.
48. In a letter dated March 21, 1949, delivered to Philips March 25, 1949, at a conference at the Bureau of Ships, the Contracting Officer expressed regret that no commercial value had materialized out of the work under the first three task orders but denied Philips’ request to be relieved of continuing to pay 40 percent of the costs under the contract, on the ground that Philips was not offering any substantial consideration to the Government for such relief. During the period of these discussions and thereafter, Philips continued with the work under the contract as before. The Navy’s report of the meeting on March 25,1949, states that Philips’ request for relief from participation in the costs was due to its realization that the work being done under the task orders had no commercial application.
49. On April 26, 1949, Philips proposed to the Navy that Task Orders Nos. 1 and 3 be terminated and that a fourth task order he issued to cover the development of an engineering prototype of a one-horsepower external combustion engine.
In support of its proposal that Task Order No. 1 be terminated, Philips pointed out various problems that had been encountered in the work on the very small one-quarter horsepower engine covered by Task Order No. 1, stated that the reliability requirements of Task Order No. 1 had been substantially satisfied in the one-quarter horsepower engine, that the engine could not be developed into a practical power plant for a generator set, and that further development work aimed at refinements to meet a specific military need was impractical and would result in an unnecessary and protracted expenditure of large sums of money and would serve no useful purpose.
*804 Philips proposed the termination of Task Order No. 3, because there was no apparent present interest in a 10-15 horsepower engine.
The proposal for Task Order No. 4 was based upon Philips’ judgment that a one-horsepower engine was the next logical step in the development work and that concentration on such an engine would best utilize the knowledge already gained under the contract and would be the cheapest, quickest, and most practical method of obtaining, at minimum cost, further practical results from the effort, time, and money already invested by the Government and Philips.
50. On May 12, 1949, the new contracting officer, Marley, rejected Philips’ proposal to terminate Task Orders Nos. 1 and 3 and initiate Task Order No. 4 covering a one-horsepower engine, on the ground that the Bureau of Ships had a specific requirement for a 125-watt and a 15-horsepower unit but had no present requirement or a one-horsepower engine.
51. On May 23,1949, Philips informed the Navy that work on Task Orders Nos. 1 and 3 was continuing but restated its view that completion of the one-quarter horsepower engine, which had been the subject of the work under Task Order No. 1, would serve no useful purpose and proposed that it build a single-acting V-type engine under Task Order No. 1 which it believed would be more compact and practical than previous models and could be completed as a manufacturing prototype for engines from one-quarter to one horsepower.
52. Following a conference at the Bureau of Ships on June 16,1949, the Navy informed Philips on June 23,1949, that its proposal to build a V-type engine under Task Order No. 1 would not be accepted and referred to an agreement whereby on or about August 15, Philips would deliver to the Navy, for final evaluation, models of the one-quarter horsepower engine which had already been built and which Philips claimed would now satisfy the reliability requirements of Task Order No. 1.
53. In a letter dated October 21, 1949, Philips stated that the one-quarter horsepower engines built under Task Order No. 1 had now met and exceeded the reliability requirements of the task order but could not satisfy the maximum size and weight requirements; although, by complete redesign which *805 would require 15 to 18 months, they could be brought closer to the Bureau’s requirements.
In regard to Task Order No. 3, Philips stated that unforeseen difficulties had been encountered in developing the 15-horsepower engines from the engineering data thus far developed and that Philips did not have at that time sufficient basic knowledge to design and build a 15-horsepower engine with a reasonable expectation of attaining the desired performance. Because of the difficulties encountered in the practical application of theoretical calculations and the need for more basic research on the larger-size engines, Philips proposed to continue the work on Task Order No. 3 on an engine of intermediate size mitil further theoretical research could indicate the correct path to follow in the work. Philips proposed a meeting with the Bureau October 25,1949, to discuss these matters.
54. On October 26, 1949, Philips confirmed conclusions reached at the conference on October 25 by the following letter:
1. As a result of a conference on Tuesday, 25 October with Bureau personnel regarding the contents of Ref. (a), it was decided by the Bureau that the subject contract be terminated for the convenience of the Government.
2. If desired by the Bureau, we shall furnish two more self-contained engine generator sets, ten sets of complete working drawings revised and brought up to date with the models delivered, ten instruction books similarly revised, and summary reports. We estimate that this material can be completed and delivered to the Bureau by 15 December 1949. It is estimated that cost to the Bureau from this date to 15 December will be $12,000-$15,000.
55. The evidence in the record does not show clearly whether Philips or the Navy proposed at the October 25, 1949, meeting that the contract be terminated. Repeatedly in subsequent correspondence the Navy claimed that Philips had proposed the termination; Phipps asserts the contrary. A handwritten notation on a thermofax copy of an official correspondence routing slip, in evidence as defendant’s exhibit 5, is the only contemporaneous evidence bearing on the question. The writer is unidentified, and his signa *806 ture is illegible. Moreover, it is not clear from the text of the notation whether the writer intended to say that the conference of October 25, 1949, had been held “As proposed by Philips Lab.” or that “As proposed by Philips Lab. dec contract will be terminated for the good of the Govt.” Regardless of who proposed the termination, the record is clear that the decision to terminate was based on a determination that termination was for the best interests of the Government.
56. By letter dated November 4, 1949, from Marley, the Contracting Officer, Philips was notified that the contract was terminated at the option of the Government and was ordered to stop all work, except for (1) assembling two engines built under Task Order No. 1, (2) assembling all technical data obtained under Task Orders Nos. 1 and 3 not previously assembled, (3) completing the instruction books for Task Order No. 1, and (4) modifying plans previously prepared under Task Orders No. 1 and 3 to bring them up to date.
The Contracting Officer requested a cost estimate from Philips for this additional work. The Contracting Officer refused to recognize Philips’ request for full reimbursement for this extra work to be done for the Navy’s benefit and insisted on the position that the termination was only a partial termination, that no task order was issued for such work, and that Philips was obligated under the contract to bear 40 percent of the cost of the work listed in the Navy’s letter of termination.
57. On November 9, 1949, Philips acknowledged the Navy’s November 4, 1949, letter and estimated the cost of the four units of work specified in that letter at $8,350, $5,575, $1,325 and $1,860.
58. Plaintiff delivered the two engines referred to in the notice of termination on December 8,1949, and the other items on December 27, 1949. On March 2, 1950, the Contracting Officer determined that Phillips’ performance was complete.
59. Disagreements arose concerning the scope of Philips’ termination claim even before it was submitted.
60. When the contract was terminated, Philips had in its possession a quantity of materials and equipment, identified *807 in Table 1 below, which had been acquired or fabricated for use in connection with the performance of the contract. Under the terms of the contract the Government had title to such materials and equipment and was entitled to possession of it upon termination of the contract. When the contract was terminated, the Government took all of it. Had the contract continued for the full 10-year term, Philips would have continued throughout that time to have the right to use such materials and equipment, as long as they might last, on work under the contract which Philips hoped would have commercial value to it and which it believes would have contributed to its engineering knowledge and technical know-how. The termination of the contract deprived Philips of the opportunity it otherwise would have had to continue using such materials and equipment.
Philips claims that by reason of the termination of the contract before the end of its 10-year maximum term, it has an equity in this inventory and, accordingly, although the contract contains no provision for payment to it of more than the 60 percent of the cost of the inventory which the Government has already paid, that it is entitled to be paid in respect of this inventory an amount equal to the total shown at the foot of Column III of Table 1.

61. When the contract was terminated, Philips had in its possession a quantity of machinery and equipment including *808 office furniture and fixtures and an automobile, herein referred to as capital equipment and generally identified in Table 2, 'below. This capital equipment had been purchased by Philips solely for use in connection with the contract and had been so used exclusively. Philips initially paid 100 percent of its cost. Except in the case of the automobile, which appears to have been amortized at a more rapid rate, the initial cost was allocated to the contract in monthly amounts equal to the total cost, divided by the number of months remaining in the 10-year contract term at the time the equipment was acquired. The Government paid to Philips 60 percent of the amounts so charged each month to the contract so that, if the contract had continued effective to the end of the 10-year term, the entire cost of the capital equipment would have been charged to the contract, and the Government would have paid to Philips an amount equal to 60 percent of the total original cost, while Philips, remaining unreimbursed for 40 percent of the original cost, would have had the right to use such equipment, as long as it might last, during the remainder of the full 10-year term on work from which Philips 'believes it would have derived commercial benefit and engineering knowledge.
The record indicates that acquisition of this capital equipment was not approved in advance by the Contracting Officer in the maimer provided by Section 4 of the contract in the case of purchases exceeding $2,000 but does not show that the cost of any but two items of such equipment (a lathe at $2,047.84 and a milling machine at $4,183.66) amounted to more than $2,000. It appears that, despite the absence of such prior approval, the Government made payments equivalent to 60 percent of the amounts charged monthly to such capital equipment. Amounts equal to the totals of the amounts so paid by the Government in respect of the several classes of capital equipment appear on the termination inventory as “Beserve for depreciation to 10/31/49 as per contractor’s books.”
Plaintiff and defendant are at odds on the question whether, as a matter of law, this capital equipment belonged to the Government or to Philips.
*809 Philips lias consistently maintained that it belonged to the Government, since it was purchased solely for use in connection with the performance of the contract and was so used exclusively, and that, by reason of the termination of the contract before the end of its 10-year maximum term, Philips has an equity in it equal to the net total of $14,-063.94 shown at the foot of Column VI of Table 2 and is entitled to be paid that amount in respect of such capital equipment.
The Government has consistently maintained that the capital equipment belonged to Philips, since it was purchased by Philips, who bore 100 percent of the initial cost and was allowed depreciation on it through overhead payments. Apparently, the Government is not concerned with what use or disposition Philips made of the property after termination or with the proceeds of its disposition.
While each of the parties denied ownership, each agreed after termination of the contract that part of the capital equipment (apparently the part described in lines A and B of Table 2) might be sold to Columbia University, and the Navy, Philips and Columbia entered into a sales agreement pursuant to which Columbia bought some part of the capital equipment. It was agreed that the proceeds of the sale would be held in escrow to be paid either to the Navy or to Philips after ownership of the equipment at the time of termination is settled by decision of this court.
Whether termination of the contract was the effective means of depriving Philips of the opportunity for further use of this equipment during all or any portion of the remainder of the 10-year period depends upon whether, as a matter of law, title to the equipment was in the Government or in Philips.
62. During the course of the work under the contract, Philips built seven engines. Three, built under Task Order No. 1, were delivered to the Navy as provided for in that task order. Four were experimental engines built for use as specialized testing and comparison equipment in the development work under the contract. These four engines were valuable pieces of test equipment which Philips expected to be available for use throughout the 10-year contract period.

*810

*811 The Government paid 60 percent of the cost of fabricating these engines and Philips paid 40 percent. Philips’ 40-percent share of the initial cost was $201,068.24. Through use of the four engines on the contract work, Philips’ share of their cost was used up or depreciated $13,408.45; so that at the time of termination of the contract, Philips’ unreim-bursed share of their depreciated cost was $187,659.79. Had the contract continued for the full 10-year term, Philips would have continued throughout the remainder of the 10-year term to have the right to use these experimental engines, as long as they might last, on work which Philips believes would have had value to it and would have developed knowledge and engineering know-how of benefit to it. Under the terms of the contract, title to these four engines was vested in the Government, and at the time of termination the Government took possession of them, and Philips was thereby deprived of the opportunity for further use of them. Philips claims it is entitled to $187,659.79 in respect of these four engines.
63. Philips’ claims, based on its assertion of an equity in the inventory on hand when the contract was terminated, which are described in Findings 60, 61 and 62, and referred to hereafter as the “termination claim,” may be summarized as follows:
(1) Engine models (Fdg. 62)-$187,659.79
(2) Materials, tools and equipment (Fdg. 60)_ 19,954.83
(3) Capital Equipment (Fdg. 61)_ 14,063.94
[3] 221, 678.06
64. Following adverse action by a Navy Cost Inspector with respect to that portion of its claim summarized in finding 63 and after some preliminary discussions and conferences, Philips formally took the matter up with the Contracting Officer, J. S. Marley, of the Bureau of Ships, Navy Department, by a letter dated June 21, 1951. At that time Philips summarized its position as follows:
(a) Contract NObs-34195 was a research and development contract in the nature of a joint venture. The *812 Government was to pay 60% of the cost of the research, and the equipment necessary to carry on that research, and the contractor was to pay 40%. The contract was to rim 10 years, unless terminated prior to that time by the United States.
(b) In anticipation of the 10-year period, the contractor invested substantial sums of money in the purchase of special equipment and the making of special tools and models. The Government reimbursed the contractor to the extent of 60% of the cost of that special equipment and the contractor bore 40 percent of that cost. Title to the material was in the United States at all times, despite the fact that the contractor paid two-fifths of the cost of it. The Government now owns a substantial inventory as a result of the contract for which it paid sixty cents on the dollar, and the contractor, according to the Cost Inspector, has nothing.
(c) The intent of the contract was that the contractor’s 40% of the cost was in the nature of rent paid in advance, in that the payment of that rent was supposed to give the contractor the right to use the special equipment and engine models and other tools for a 10-year period.
(d) Contractor realizes the right of the United States to terminate the contract, but it contends that that right exists only on fair, equitable terms. It feels that it is inequitable for the United States to retain title to the inventory on hand at the termination and not to adjust in some way the 40% that the contractor advanced toward the cost of that inventory.
(e) Contractor’s suggested adjustment and its claim in termination is that the United States retain title to the inventory, but that it refund to the contractor a part of the money which it contributed toward the purchase or cost of it on an amortized basis. The contract was intended to run for 10 years. It terminated at the end of Sy2 years. Hence, contractor contends that it should be reimbursed to the extent of 65% of the moneys that it advanced toward the cost of the inventory, special equipment and models.
(f) The contract is not too clear as to contractor’s rights in the event of termination. The standard termination provisions are not broad enough to cover a contract such as that here in question. But contractor contends that because of the termination it has not been properly compensated under the contract for the moneys it advanced. It claims that it is entitled to receive back in the termination settlement the unamortized part of the money advanced, which is now represented by the *813 special equipment. The contract provides that the contractor is to receive, in termination, all costs and expenses for which it “is to be reimbursed or otherwise compensated.”
(g) Even though the contract were silent as to the rights of the contractor in termination, under the Contract Settlement Act (TJ.S. Code, Title 41, Sec. 117(b)) the contracting agency could not take advantage of the omission or defect. The contractor maintains that the Government should amend the contract and make a fair settlement of the obligation of the United States.
(h) As heretofore indicated, a fair settlement in all equity should adjust in some way the amounts advanced by the contractor, and equalize the property account.
$ ‡ $

The Inegwity of Government's Position

36. In Section A of the schedule attached to the contract, entitled “Specific Compensation Provisions,” the Government agreed, in effect, to spend $1,300,000 to develop, with the aid and assistance of the contractor, various types of external combustion engines. The contractor had to and did start with a certain know-how in this particular field. It contributed that. The Government and the contractor both realized that the outcome of the development project was a doubtful one, and neither made any guarantees with respect to the outcome. The contractor, however, had the right to expect that it would be permitted to carry on the research and development work contemplated by the contract for a period of approximately ten years. The contractor had to have a great deal of special testing equipment, such as meters, dynamometers, and the like. It was necessary that it build some models so that tests and other calculations could be made for the purpose of developing the formulas which would serve as a basic method for the construction of external combustion engines. This equipment and these models, of course, cost a substantial amount of money to build. The Government paid 60% of that cost and the contractor paid 40% of that cost. It was willing to spend that 40% because, first, it expected to use the equipment and model engines throughout the life of the contract for experimental purposes. In addition, by reason of the knowledge gained through the experiments made on those test engines, and others that were to follow, the contractor was to get the benefit of hoped-for commercial applications that would be of value to the contractor. In other words, if a satisfactory engine were *814 developed over the ten-year period that had commercial value, contractor was to get that commercial value and the Government was to get, for its 60%, licenses to utilize the engine in all of its aspects, and licenses to utilize any patents that resulted from any experimental projects conducted in accordance with the contract provisions.
‡ % * * H*

Technical Positions Under the Contract Settlement Act {Section 117(b) of Title 4-1)

51. The position of the Cost Inspector with reference to the contractor’s inventory is certainly a highly technical one. There is absolutely no equity in it. In addition, it violates the spirit and intent that was in the minds of both parties when negotiations leading up to the letter of intent of September 26, 1945 and the contract were taking place.
52. The most that can be said of the position taken by the Cost Inspector is that the contract is silent as to what happens to the contractor’s 40% if and when the contract is terminated. We disagree with this, but even though the contract is silent, that does not help the Government.
53. Section 117 (b) of Title 41, U.S. Code (The Contract Settlement Act), provides:
“Whenever any formal or technical defect or omission hi any prime contract, or in any grant of authority to an officer or agent of a contracting agency who ordered any materials, services, and facilities might invalidate the contract or commitment, the contracting agency (1) shall not take advantage of such defect or omission; (2) shall amend, confirm or ratify such contract or commitment without consideration in order to cure such defect or omission; and (3) shall make a fair settlement of any obligation thereby created or incurred by such agency, either expressed or implied, in fact or in law, or m the nature of an implied or quasi contract.”
54. The contractor in this case is merely asking that it be refunded a part of the money it spent for special equipment, for engine models, and for other tools on hand at the termination, on the ground that it paid part of the cost of them and it had a right to use them throughout the term of the contract. It should be entitled to all of its costs on a quantmn, meruit basis.
55. It is true that the contract does not spell out what contractor’s rights are under this situation, but even if it did not cover the situation at all the Government “shall not take advantage of such defect or omission.” It shall amend the contract to cure such defect or omission.
*815 56. If this problem now confronting the officials in termination had been discussed by the negotiators, which we submit it was not, it is patent that a provision, the effect of which would be that if the contractor bought special tools during the first year of the contract and was reimbursed to the extent of 60% of the cost of those special tools but used them only three years because of termination, it would be allowed on termination an amount equal to seven-tenths of 40% of the cost, would have been inserted.
51. The Contract Settlement Act requires that a fair settlement be made. Is it fair, in this case, for the Government to take all of the equipment on hand for which it paid only 60% of cost and which was used by the contractor only three years and in some instances much less, and not in some way adjust with the contractor? We submit the question answers itself.
58. Certainly some obligations with respect to the inventory is created by the termination. The Government would never consent to the contractor using it for the unfinished term of the contract and pay itself out in that manner. It is submitted the Government’s obligation is well covered by (3) above, that is, it is an obligation “either expressed or implied, in fact or in law, or in the nature of an implied or quasi contract,” and a fair settlement should be made.

Oonolmion

59. In view of the fact that there is really only one preliminary question to be determined before this termination claim can be settled, there is no point, at this time, in trying to detail the claim either as to inventory or capital expenditures or disallowances. For that reason, we are not attempting to break down or itemize the contractor’s claim. We are asking for a ruling at this time on the broad legal question heretofore presented.
60. It is suggested that after your legal department has had an opportunity to consider this memorandum, a conference be arranged during which the matters herein contained be discussed orally and the specific amounts of the various items of the claim can also be discussed.
65. On November 1,1952, J. C. Marley, as Senior Negotiator on behalf of the Bureau of Ships, replied to Philips’ letter of June 21,1951. Marley’s letter summarized the Bureau’s position with respect to the legal questions involved in the pending settlement proposals and its views concern *816 ing the factual basis of the controversy. He concluded by rejecting Philips’ claim for reimbursement for its asserted equity in the termination inventory.
The legal grounds stated were that, under the contract, the Govermnent had the legal right to terminate and, upon doing so, to retain the inventory; that there was no authority under the termination regulations to pay Philips more than the 60 percent of the inventory cost which the contract obligated the Government to pay in connection with Task Orders Nos. 1, 2 and 3; and that Section 117 (b) of the Contract Settlement Act (41 U.S.C. 117(b)) is inapplicable because: (a) the failure of the termination clause of the contract specifically to provide for adjustments in case of termination before the end of its 10-year maximum term was not a “defect or omission”; (b) if there is a “defect or omission,” it is manifestly of a “substantive” rather than of a “formal or technical” nature; and (c) if “formal or technical,” it is not a defect that would invalidate the contract.
Among the factual bases for these conclusions, Marley’s letter stated as the Government’s position that the contract was a cost-sharing type of contract; that Philips had requested the Government to terminate the contract; and that the Government in terminating all but a small portion of the work under the contract had done so in compliance with Philips’ request.
The evidence in the record does not clearly support the assertion made in the letter that Philips had requested that the contract be terminated or that, in terminating it, the Government had been motivated by Philips’ request. It seems to be clear enough from the record that, regardless of whether Philips requested termination, the termination was based on a determination that termination was in the best interests of the Government.
66. On May 24, 1954, Philips submitted an invoice to the Navy covering expenses from December 29,1949, to December 31, 1953 (referred to hereafter as the “post-termination claim”), totaling $71,457.21, as follows:
1. Preparation of termination inventory schedule-$7, 390.21
2. Preparation of settlement proposal- 3, 806. 00
3. Maintenance and supervision of inventory_ 5,286.23
4. Packing and shipping of inventory_ 6, 273.11
*817 5. Legal expenses- 18,864.34
6. Preparation of memorandum and letter to Bureau__ 2, 464.31
7. Negotiation of contract with Columbia University pertaining to capital equipment_ 2, 564.31
8. Preparation of answer to Bureau of Ships letter of Nov. 17, 1952- 3, 394. 58
9. Interest on settlement proposal_ 26, 760.23
10.Interest on loan capital_ 1,666.67
78,469.99
Less: Termination Expenses Included in Settlement Proposal_ 7, 012. 78
71,457.21
This claim was submitted to a Navy Cost Inspector for audit. He disapproved a total of $2,612.81 consisting of expenses claimed for auditing, miscellaneous expense and entertainment, and recommended further consideration of the remaining items totaling $68,844.40, since he believed they required technical interpretation as to their necessity and propriety. He found that all these costs had been incurred and paid, with the exception of interest and payments contingent upon final settlement.
67. On July 1, 1954, the Philips Laboratories, Inc., was merged with North American Philips Co., and on or about January 17,1955, entered into a novation agreement with the Navy which designated North American Philips Co. as the successor in interest to Philips Laboratories, Inc., under the contract.
68. On January 5, 1955, the Supervisory Inspector of Naval Material New York reported to the Chief of the Navy Bureau of Ships concerning most of the $68,844.40 post-termination claims set out for further consideration as described in finding 66. The items considered were broken down into categories more detailed than those used heretofore in the summarization of Philips’ claims as follows:

Indirect Labor:

W. E. Donovan, Philips; Manager_$10, 416
W. S. Howell, Storekeeper- 3, 593

Outside Services:

L. P. Granner, Inc_ 14,142
Philips Laboratories, Inc_ 875
A. J. Phelan- 5, 500
*818 Outside Services — Continued
A. Worsnup- 1,838
Export Packing and Crating Co- 1,400

Other Expenses:

Rent_ 2,900
Interest — Settlement Proposal- 26, 760
66,424
The Supervisory Inspector’s comments concerning these items may be summarized as follows:
(a) Concerning the claim of $10,416 for Donovan’s salary as indirect labor at $10,000 per year between February 1, 1950, and February 15, 1951 — that Philips had been notified that settlement expenses were to be kept at a minimum and that use of high salaried employees was to be carefully controlled, that Philips’ settlement proposal was dated February 5, 1950, and a corrected proposal was submitted April 13,1950, and that reimbursement for Donovan’s salary at a rate “considered to be fair and proper” up to May 31,1950, would be more reasonable. No specific amount was recommended.
(b) Concerning the claim of $3,593 for salary of W. S. Howell, as Storekeeper, from February 1,1950, to March 15, 1951 — that the physical inventory was completed by March 23,1950, that the presence and allocability of the property was verified by the Navy May 18, 1950, that all the Navy property was removed by February 1951, and that there appears to have been no need for a full-time storekeeper (or guard) during most of this period. Eeimbursement of this labor charge in part was recommended, without specification of any particular amount.
(c) Concerning the claim of $14,142 for reimbursement of payments made to L. P. Granner, Inc., consisting of $2,850 for rent and services in connection with office space in New York City from February 1,1950, to August 31,1951, and $11,292 salary of Mr. Donovan (who was president of L. P. Granner, Inc.) for services during the period February 16, 1951, through April 30, 1952, and for some additional services during 1952 and 1953— that the New York City office should have been dispensed with inasmuch as adequate office space was available in Dobbs Ferry where the inventory was located, and that time spent by Donovan between February 1951 and 1953 does not appear to have been spent in connection with “inherent” preparation, submission or normal processing of the contractor’s proposal.
*819 (d) Concerning a claim of $975 by Philips Laboratories, Inc., for the salary of Mr. Moore, an accountant for Philips — that Mr. Moore was present at the majority of the conferences during processing of the termination claim and is undoubtedly entitled to reasonable reimbursement for time and effort devoted to the terminated contract, but that a detailed breakdown of the period and rate of reimbursement should be furnished.
(e) Concerning a claim of $5,500 for amounts paid A. J. Phelan — that Mr. Phelan had not been mentioned to the inspector during the processing of the claim and was not listed in 1949 among the personnel who would be concerned with the termination, and that, if he had been consulted with respect to appeal procedures “etc.,” reimbursement would be prohibited under the regulations.
(f) Concerning a claim of $1,838 for reimbursement of salary paid to A. Worsnup who had been treasurer of Philips — that Mr. Worsnup was present on one occasion during the Inspector’s discussions with Philips but that his functions in connection with the terminated contract were unknown and that the necessity for his services, in view of the availability of Mr. Donovan, were “extremely questionable.”
(g) Concerning a claim of $1,400 for packing and crating of inventory — that these charges are recommended for acceptance since the award and the packing and crating were done under the supervision of the Supervisory Inspector and were found to be satisfactory.
(h) Concerning a claim of $2,900 for rent for space occupied at Dobbs Ferry — that all termination inventory was removed by February 15, 1951, and there is no basis for authorizing rental through May 31 of that year, that the rate of $225 for the period February 1, 1950, to January 31, 1951, warrants further consideration since the plant appears to have been vacant then, that processing of the terminated contract involved the use of only one wing of the Dobbs Ferry building and that Philips should be required to indicate the size of the area occupied by the inventory and office in order to permit a reasonable rental rate to be determined.
(i) As to a claim of $26,760 for interest on the settlement proposal, the Supervisory Inspector commented that—
The Contract Settlement Act (and the Joint Termination Regulation) provide for interest on termination *820 claims at the rate of 2%% per annum. The regulations also provide, however (paragraph 572.8(4) of JTB.) that “if the contractor unreasonably delays submission and settlements of his claim, no interest shall accrue for the period of such delay”. Final determination of interest would accordingly be predicated upon the amount of acceptable charges and determination as to the contractor’s responsibility for delay in settlement of subject proposal.
69. On August 15, 1955, attempts to settle these claims by negotiation having failed, C. W. Brockman, then the Contracting Officer, wrote Philips offering a settlement of $50,000 on the following terms:
In the interest of disposing of this matter without further delay, the Contracting Officer hereby offers the amount of $50,000.00 in full and final settlement of your termination claim under contract NObs-34195. This offer will remain open for thirty days from the date of your receipt of this letter. If you wish to present, within the thirty-day period, additional evidence in substantiation of the amount claimed by you, such evidence will be reviewed by the Contracting Officer.
It is understood and agreed that payment to you of the aforesaid $50,000.00 constitutes full and final settlement of each and every claim of whatsoever nature which you have asserted or can assert against the Government and arising from the termination of contract NObs-34195. Without limiting the generality of the foregoing, it is specifically agreed that payment of the aforesaid $50,000.00 includes full payment for your claim of a 40% equity in the termination inventory.
It is further understood and agreed that title to the Capital Equipment listed on pages 30 to 35 inclusive of the inventory schedule is vested in Philips Laboratories, Inc.
Pursuant to Paragraph 752.2 of the Joint Termination Regulation, you are hereby notified that unless acceptance of this proposed settlement, or additional evidence supporting your claim for a greater amount, is received by the Contracting Officer prior to the expiration of the thirty-day period specified above, the Contracting Officer shall proceed to determine the amount due you and shall serve such findings on you.
70. On September 13, 1955, Philips declined the $50,000 settlement proposed by the Navy, again summarized its claims and its contentions concerning them, proposed a settle *821 ment for $250,000, and requested that, if this counter-proposal should be rejected, the Contracting Officer proceed as rapidly as possible to determine the amount he contends is due Philips and to make the findings of fact required by the termination regulations. In this letter Philips denied that the contract was terminated by any request of Philips.
The claims asserted included a total termination claim of $271,387.22 and a claim for post-termination expenses of $71,457.21.
Claims for the cost of commercial development and for the costs of transferring the project to the United States and returning it to Holland, asserted in this letter, are not included in the amount claimed in this action.
71. On May 15, 1956, J. C. Marley, as Contracting Officer for the Navy, wrote Philips, again summarizing the Navy’s position with respect to the facts and the legal issues in a manner generally consistent with the position stated by representatives of the Navy in previous communications, and concluded with a determination that $50,730.43 was due to Philips.
The total of $50,730.43 allowed consisted of $38,825.87 allowed against Philips’ termination claim (stated by Marley as $273,711.34) and $11,904.56 allowed against Philips’ post-termination claim of $71,457.21.
Marley’s letter included a detailed comparison of the amounts claimed by Philips and the amounts allowed by the Contracting Officer and stated reasons for disallowance of the various claims as follows:
A. Of the termination claim, $38,825.87 was allowed. The following reasons were stated for disallowance of items totaling $247,357.74 which, after credits of $12,472.24, resulted in net disallowances of $234,885.50 on the termination claims:
(1) $21 £62.57 claimed for direct labor was disallowed on the grounds—
that $10,922.96 claimed as holiday and sick leave costs had been included in an overhead pool and reimbursed as indirect factory expense;
that $6,601.08 claimed as salary of two employees had been included in overhead and reimbursed as indirect factory expense; *822 that $3,826.89 claimed as bonuses bad never been paid to tbe employees for whom the accrual was made; and
that $211.14- claimed as direct labor cost on January 3, 1946, was 'beyond the scope of the contract which provided for reimbursement of costs incurred after January 3,1946.
(2) $1,79632 claimed as indirect factory expense was disallowed on the grounds—
that $22538 related to overhead in labor expended January 3, 1946, before the beginning of the period covered by the contract;
that $4,636.98 related to direct labor of two employees had been included in overhead payments as indirect expense;
whereas, Philips was entitled to a credit of $3,066.04 for indirect factory expense on the ground that $3,066.04 less was claimed than was due under a proper computation of certain elements of indirect factory expense.
(3) $221,882.17 claimed as unreimbursed equity in the closing inventory was disallowed.
(4) $2,116.78 of a claim of $7,012.78 for settlement expense was disallowed to eliminate therefrom an allegedly improper claim for a portion of the salary paid to one employee amounting to $416.66, the social security tax of $27.47 thereon, an alleged overstatement of auditing expense by $5.98, and interest of $1,666.67 said to have been allowed under another item of the settlement. $4,896 was allowed as settlement expenses.
B. Of the post-termination claim of $71,457.21, $11,904.56 was allowed. The following reasons were stated for disallowance of a total of $40,049.28 claimed as post-termination expenses, $24,849.48 claimed as interest on Philips’ settlement proposal, and $1,666.67 claimed as interest on loan capital.
(1) $7,39031 claimed as cost of preparing the termination inventory schedule was disallowed on the ground that all of such cost was considered in arriving at an allowance of $4,896 as settlement expenses included in the total of $38,825.87 found to be due on the termination claim.
(2) $3,306 claimed as cost of preparing the original settlement proposal was disallowed on the ground that it too was considered in arriving at the allowance of $4,896 as settlement expense as an element of the $38,825.87 allowed on the termination claim. $500 was allowed as adequate to cover the cost of preparing the *823 supplemental claims which, included the claim for post-termination expenses.
(3) $1,692 of a total claim of $5,286.23 for maintenance and supervision of inventory was disallowed on the ground that no evidence was submitted to substantiate expenditures of more than the $3,593.81 allowed as covering wages paid to a storekeeper for the period February 1,1950, through March 15,1951.
(4) $4,878.11 of a total claim of $6,273.11 for packing and shipping of inventory was disallowed on the ground that no evidence was submitted to substantiate expenses of more than $1,400 allowed as covering charges of the Export Packing and Crating Company for packing and crating the termination inventory.
(5) $16,864-84 of a total of $18,864.34 claimed for legal expenses was disallowed on the ground that any expense in excess of $2,500 for legal services in connection with the claim were deemed to be unreasonable, excessive and incurred for unnecessary services.
(6) $1,464-81 of a total of $2,464.31 claimed for preparation of a memorandum and letter to the Navy (including costs of necessary meetings in Washington and New York) was disallowed as unsupported by evidence of the expenditure. $1,000 was allowed as reasonable compensation for this work.
(7) $2,564-81 claimed as expense of negotiating a contract with Columbia University for disposition of capital equipment was disallowed on the ground that the capital equipment belonged to Philips and that Philips, accordingly, should bear the cost of its disposition.
(8) $2,394-58 of a claim of $3,394.58 for preparation of an answer to the Navy’s letter of November 17, 1952, was disallowed as unsupported by evidence of the expenditure. $1,000 was allowed as reasonable compensation for this work.
The disallowances of expenses described in Items 1-8, inclusive, total $40,049.28.
(10) $24,848-48 of a claim of $26,760.23 for interest on the full amount of Philips’ termination claim was disallowed. In addition to $2,708.56 of interest allowed and included in the $38,825.87 found to be due on the termination claim, $1,910.75 was allowed as interest at 2% percent per annum on $46,110.92 total gross settlement, exclusive of interest for one year and eight months commencing June 1,1954, and ending January 31,1956.
(11) $1,666.67 claimed as interest on loan capital was disallowed on the ground that interest on loan capital is included as an item of expense in the overhead pool *824 used in establishing the overhead rate for the period July 1, 1949, to December 1, 1949, and is not a proper charge in the termination settlement.
(12) A credit was given to Philips for $7,012.78 of termination expense included in Philips’ original settlement proposal on the ground that it had been considered and allowed insofar as acceptable in the allowance of $38,825.87 found to be due on the termination claim and that, accordingly, the Navy was not entitled to the credit stated in Philips’ post-termination claim.
The Contracting Officer made no specific finding with respect to claims totaling $11,559.34 relating to rental of storage space and other inventory transfer costs and costs of maintaining the property which had been the subject of comment by the Navy cost inspectors.
72. North American Philips Co. brought suit against the United States in the Court of Claims on August 13, 1956, within 90 days of the date of the Contracting Officer’s findings expressed in his letter of May 15,1956.
73. In February of 1959 the Navy issued its check payable to the order of North American Philips Co. in the sum of $45,657.39, representing nine-tenths of the amount of $50,-730.43 found to be due by the Contracting Officer on May 15, 1956, as described in finding 71.
74. In view of the plaintiff’s persistent assertion of its claims and the fact that its concept of their legal bases differed broadly from that of the defendant, it is not apparent that its failure to conform with the defendant’s views as to the claims that should be submitted or its refusal to accept the settlements proposed by the defendant, constituted unreasonable delay in submission and settlement of its claims.
75. It is recommended that determination of the specific amounts, if any, that plaintiff may be entitled to recover, be reserved, pursuant to Buie 38(c), for determination in further proceedings to follow determination of the issues relating to plaintiff’s right to recover, for the following reasons:
(a) The $221,882.17 plaintiff claims under the First Count is based on its assertion of an equity in the termination inventory equal to the total of the amounts stated opposite each of the following items:
*825 1. Engine models_$187, 659. 79
2. Materials, tools and equipment_ 19, 954.38
3. Capital equipment_ 14,063. 94
According to the evidence in the record, these items (less $240.11 worth of missing capital equipment) were present in inventory when the contract was terminated and the amounts stated represent the share of the un-amortized portion of their cost that was paid for by the plaintiff.
Consequently, if the court should find that the plaintiff is entitled, as a matter of law, to an equity measured by its share of the unamortized cost of this material, these amounts (less the $240.11 of missing capital equipment) would represent the measure of plaintiff’s recovery under the First Count as to all of the inventory found to belong to the defendant.[4]
Whether they may be regarded as appropriate elements of the plaintiff’s damages depends, in the first instance however, upon the court’s decision whether the plaintiff is entitled to an equity in these inventories and, if so, whether the plaintiff’s share of their cost represents a fair and reasonable measure of the equity so found.
Furthermore, if the court should find generally that the plaintiff has such an equity in the inventories owned by the defendant, a secondary legal contingency must be resolved — whether title to the capital goods was in the plaintiff or the defendant — before it can be determined whether all or any part of the $14,063.94 attributable to the capital goods inventory may be included in plaintiff’s damages.
(b) The dollar amount of any interest to which the plaintiff may be entitled under the Second Count is contingent upon the determination not only of the total principal amount the plaintiff is entitled to recover but also the period for which, as a matter of law, interest should be paid on that amount.
(c) What part, if any, plaintiff may recover of the $21,562.57 claimed under the Third Count by reason of *826 the allegedly improper disallowance of certain labor costs and other items (less costs incurred on January 3, 1946) is contingent upon the court’s decision with respect to the First Count, inasmuch as the plaintiff has stated in its proposed findings that it is willing to withdraw its claim under the Third Count if its claim under the First Count should be allowed. Moreover, in case the plaintiff should persist in its claim under the Third Count, determination of the amount due will require consideration of evidence not now in the record concerning the necessity or propriety of certain expenditures which form the basis of this part of its claim.
(d) The plaintiff’s claim of $40,049.28 under the Fourth Count for settlement expenses disallowed from its post-termination claim include a claim for expenses incurred in arranging for disposal of a part of the capital equipment inventory to Columbia University. Whether the plaintiff is entitled to recover such expenses is contingent in part upon the court’s determination whether the plaintiff or the defendant had title to the capital equipment. Moreover, the amounts due under the Fourth Count also will require consideration of evidence, not now available in the record, concerning the necessity and propriety of certain of plaintiff’s post-termination expenditures.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment will be entered to that effect.
The amount of recovery will be determined pursuant to Rules 38(c) of the Rules of this court.
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on February 23, 1962, that judgment for plaintiff be entered for $72,500.

 Defendant avers in its brief that due to health of -witnesses, difficulty of proof due to the lapse of time and the death of witnesses, and in the interest of economy of time and expense, counsel for the respective parties agreed that the Government’s files and the plaintiff's files, insofar as they were pertinent, could be turned over to the commissioner in the form of exhibits so that he could produce a set of findings of fact which would eliminate the need of taking testimony in this case, and at the same time be sufficient to present the legal issue.
It is now apparent that enough facts are in the record to present legal issue, but the facts relative to the amount of recovery are not present.
Defendant argues that it would not have consented to the procedure had plaintiff not represented that it would dispose of the entire case. There was no actual separation of the issues, but under the circumstances a separation of issues would be a normal procedure, and we will view the record as if there had been an actual separation of liability and amount of recovery.

 The Boykin Act proposed to make provision for late registration of foreign patents in the united States. In exchange for this right, granted to remedy the inequities created by wartime prevention of patent registration, the united States would take certain licensing rights to patents so registered, thereby depriving the patent holder of certain patent benefits and protections, in regard to Government use of his patents, in the united States.

 The difference between this amount and tbe $221,822.17 claimed in the First Count of the Petition is the $204.11 identified in Table 2 above (finding 61) as “missing equipment.”

 The fact that some or all of these items might be used up or worn out before the end of the ten-year period would not appear to diminish the value that might accrue to the plaintiff from the opportunity, forestalled by termination of the contract, to use them in its development work as long as they might last. The possibility that some or all of them might outlast the contract period, and thus have some residual value that plaintiff could not realize through the use of them within the full ten-year term, is so remote and conjectural as to< form, at best, a dubious basis for discounting these amounts as a measure of the value of plaintiff's equity if the court should find it has one.